**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STAR SCIENTIFIC, INCORPORATED, a
Delaware corporation,
                    *Plaintiff-Appellant,*

v.

RANDOLPH A. BEALES, in his official
capacity as Attorney General,
                    *Defendant-Appellee.*

DKT LIBERTY PROJECT; ALABAMA;
ALASKA; ARIZONA; ARKANSAS;
CALIFORNIA; CONNECTICUT; DELAWARE;
THE DISTRICT OF COLUMBIA; GEORGIA;
HAWAII; IDAHO; ILLINOIS; INDIANA;
IOWA; KANSAS; KENTUCKY; LOUISIANA;
MAINE; MARYLAND; MASSACHUSETTS;
MICHIGAN; MINNESOTA; MISSOURI;        No. 01-1502
MONTANA; NEBRASKA; NEVADA; NEW
HAMPSHIRE; NEW JERSEY; NEW MEXICO;
NEW YORK; NORTH CAROLINA; NORTH
DAKOTA; NORTHERN MARIANA ISLANDS;
OHIO; OKLAHOMA; OREGON;
PENNSYLVANIA; PUERTO RICO; SOUTH
CAROLINA; SOUTH DAKOTA; TENNESSEE;
UTAH; VERMONT; WASHINGTON; WEST
VIRGINIA; WISCONSIN; WYOMING;
AMERICAN LEGACY FOUNDATION;
AMERICAN CANCER SOCIETY; AMERICAN
HEART ASSOCIATION; AMERICAN LUNG
ASSOCIATION; NATIONAL CENTER FOR
TOBACCO-FREE KIDS,
                    *Amici Curiae.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-00-835-3)

Argued: November 1, 2001

Decided: January 22, 2002

Before NIEMEYER, WILLIAMS, and GREGORY,*
Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams joined.

---

## COUNSEL

**ARGUED:** Charles Fried, Cambridge, Massachusetts, for Appellant. Gregory E. Lucyk, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Patrick M. McSweeney, Kathleen Moriarty Mueller, John L. Marshall, Jr., MCSWEENEY & CRUMP, P.C., Richmond, Virginia; James F. Neal, James G. Thomas, W. David Bridgers, NEAL & HARWELL, P.L.C., Nashville, Tennessee, for Appellant. Randolph A. Beales, Attorney General of Virginia, Francis S. Ferguson, Chief Deputy Attorney General, J. Steven Sheppard, III, Senior Assistant Attorney General, David B. Irvin, Senior Assistant Attorney General, Sydney E. Rab, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. William M. Hohengarten, Julie M. Carpenter, Janis C. Kestenbaum, JENNER & BLOCK, L.L.C., Washington, D.C., for Amicus Curiae DKT Liberty Project. Bill Lockyer, Attorney General of the State of

---

   *Judge Gregory heard oral argument in this case but has since recused himself. The decision is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

California, Richard M. Frank, Chief Assistant Attorney General, Dennis Eckhart, Senior Assistant Attorney General, Karen Leaf, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Sacramento, California, for Amici Curiae States. Ellen J. Vargyas, AMERICAN LEGACY FOUNDATION, Washington, D.C.; Jonathan E. Nuechterlein, Jonathan J. Frankel, Mary E. Kostel, C. Colin Rushing, WILMER, CUTLER & PICKERING, Washington, D.C., for Amici Curiae Foundation, et al.

---

**OPINION**

NIEMEYER, Circuit Judge:

Star Scientific, Inc., a cigarette manufacturer, challenges the constitutionality of the Master Settlement Agreement of November 16, 1998, between the Commonwealth of Virginia — as well as 45 other States — and the major tobacco manufacturers. It also challenges the constitutionality of legislation enacted by the Commonwealth of Virginia to qualify it to receive payments under the Master Settlement Agreement.

To settle the States' lawsuits against the major tobacco manufacturers arising from their development and marketing of cigarettes, Virginia and the 45 other States, as well as the District of Columbia and 5 territories, entered into a Master Settlement Agreement with Phillip Morris, Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, and Lorillard Tobacco Company. The Master Settlement Agreement calls for the tobacco manufacturers to pay the States, in exchange for releases from liability for past and future damages, approximately $200 billion over the next 25 years, including approximately $4.1 billion to the Commonwealth of Virginia.

Star Scientific, which contends that it has not engaged in the misconduct attributed to the major tobacco manufacturers and was not sued by any of the States, asserts that it will be unjustly burdened by the requirements of the Master Settlement Agreement and the legislation that Virginia enacted pursuant to the agreement. It therefore commenced this action to challenge the constitutionality of both the

settlement agreement and the statute. The district court granted Virginia's motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

On appeal, Star Scientific contends that the statute enacted pursuant to the Master Settlement Agreement, Va. Code Ann. §§ 3.1-336.1 & 3.1-336.2, violates its rights under the Due Process, Equal Protection, and Commerce Clauses of the United States Constitution. It also contends that the Master Settlement Agreement itself violates the Compact Clause.

For the reasons that follow, we affirm.

I

In 1994, the Attorneys General of Mississippi, Minnesota, West Virginia, and Massachusetts filed lawsuits in their respective State courts against the major tobacco manufacturers, Phillip Morris, R.J. Reynolds, Brown & Williamson, and Lorillard, seeking reimbursement for healthcare expenditures made by those states on behalf of citizens suffering from tobacco-related diseases. By 1996, 15 additional states had filed similar suits. Although the States' respective complaints varied, they shared a common theme, alleging that the major tobacco companies (1) had misled and deceived the public by suppressing internal research about the risks and addictive properties of cigarettes, (2) had committed fraud and had engaged in racketeering activity through their efforts to disseminate false statements about the addictive nature of nicotine and the adverse health effects of smoking, and (3) had violated antitrust laws by, among other things, conspiring to suppress the development and marketing of safer cigarettes.

By 1997, after several more States had filed similar lawsuits, the major tobacco manufacturers negotiated with a group of State Attorneys General to reach a comprehensive nationwide settlement of the claims. The settlement, which was known as "the Tobacco Resolution," was contingent on congressional approval. Accordingly, federal legislation to implement the Tobacco Resolution was introduced in the Senate in November 1997. The major tobacco manufacturers, however, withdrew their support of this legislation when it appeared

that the legislation would require them to pay more money and accept greater regulatory and marketing restrictions than they had agreed to in the Tobacco Resolution. Thus, the legislation was never enacted.

In the meantime, the major tobacco companies reached individual settlements with Mississippi, Florida, Texas, and Minnesota. And, upon failure of the Tobacco Resolution, several other State Attorneys General initiated negotiations with two of the tobacco companies on a new multi-state settlement. On November 16, 1998, a group of State Attorneys General and the major tobacco manufacturers reached an agreement called the "Master Settlement Agreement." This agreement permitted nonsettling States to participate if they acted within seven days.

The Commonwealth of Virginia, which had not participated in the original settlement discussions, decided to join the Master Settlement Agreement and, for that purpose, commenced an action in State court against Brown & Williamson, Liggett Group, Inc., Lorillard, Phillip Morris, R.J. Reynolds, and United States Tobacco Company on December 23, 1998. In its complaint, Virginia alleged that it spends millions of dollars each year to pay healthcare costs caused by tobacco-related diseases. It contended that the tobacco companies misrepresented the health effects of tobacco while simultaneously suppressing research revealing the dangers of tobacco products. The complaint also asserted that the defendants acted in concert to suppress research and preserve their markets. Finally, it alleged that the companies specifically targeted youth in their advertisements and marketing campaigns "to induce such persons to start using tobacco products and increase [the manufacturers'] sales of tobacco products." The complaint alleged violations of the Virginia Antitrust Act, the Virginia Consumer Protection Act, and claims for unjust enrichment and restitution, and sought declaratory relief, injunctive relief, restitution, damages, costs, and attorneys fees.

After filing its complaint, Virginia, along with the other 45 states that had not already settled with the major tobacco companies, the District of Columbia, and 5 territories, agreed to sign on to the Master Settlement Agreement. Virginia's litigation in State court was accordingly terminated by a consent decree and final judgment, dated February 23, 1999, providing that "the [Master Settlement Agreement] set

forth therein, and the establishment of the escrow provided for therein are hereby approved in all respects, and all claims are hereby dismissed with prejudice as provided therein." Star Scientific was not named a defendant in that action and did not participate in the Master Settlement Agreement.

Under the Master Settlement Agreement, the States released the participating tobacco manufacturers from all claims for past conduct based on the sale, use, and marketing of tobacco products. They also released future monetary claims arising out of exposure to tobacco products, including future claims for reimbursement of healthcare costs allegedly associated with the use of or exposure to tobacco products.

In return, the participating tobacco manufacturers agreed to conduct restrictions and to annual payments to the States. Among the conduct restrictions were agreements (1) to refrain from targeting youth in the advertising and marketing of tobacco products; (2) to refrain from using cartoon characters to promote cigarette sales; (3) to limit tobacco brand-name sponsorships of athletic and other events; (4) to refrain from lobbying Congress to preempt or diminish the States' rights under the Master Settlement Agreement or to advocate that settlement proceeds under the Master Settlement Agreement be used for programs other than those related to tobacco or health; (5) to dissolve the Tobacco Institute, the Council for Tobacco Research, and the Center for Indoor Air Research; and (6) to refrain from suppressing research relating to smoking and health and misrepresenting the dangers of using tobacco products. The participating manufacturers also agreed to make annual payments "in perpetuity" for the damages caused to the States. It is estimated that through these payments, the States will receive more than $200 billion through 2025, of which Virginia will receive 2.045% or approximately $4.1 billion. Finally, the participating manufacturers agreed to pay the States' costs and attorneys fees.

The Master Settlement Agreement permits other tobacco companies to participate in the benefits of the agreement as "Subsequent Participating Manufacturers." Subsequent Participating Manufacturers are not required to make any payments under the Master Settlement Agreement unless their share of the national cigarette market exceeds

the greater of their 1998 market share or 125% of their 1997 market share. Any payments that would be required would be tied to the Subsequent Participating Manufacturers' market shares.

Because of a concern that manufacturers participating in the Master Settlement Agreement might suffer a competitive disadvantage when compared to nonparticipating manufacturers and that this disadvantage could affect the participating manufacturers' ability to make the settlement payments, the Master Settlement Agreement includes provisions to protect the market shares and profitability of the participating manufacturers. Thus, one provision of the Master Settlement Agreement allows for participating manufacturers to reduce their damage payments if they lose market share during a given year, as determined by the "Firm," a group of economic consultants designated under procedures established in the Master Settlement Agreement. In addition, the Master Settlement Agreement requires the States to enact a qualifying statute that "effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non-Participating Manufacturers within such Settling State[s] as a result of the provisions of this Agreement." If a State does not enact and "diligently enforce[ ]" a qualifying statute, it can lose future payments under the Master Settlement Agreement.

Virginia enacted a qualifying statute in March 1999 in a form substantially similar to the model qualifying statute included in the Master Settlement Agreement. *See* Va. Code Ann. §§ 3.1-336.1 & 3.1-336.2. Virginia's qualifying statute provides that any tobacco manufacturer "selling cigarettes to consumers within the Commonwealth," whether directly or indirectly, shall (1) become a participating manufacturer and sign the Master Settlement Agreement, or (2) place into an escrow fund an amount determined by the number of cigarettes that the nonparticipating manufacturer sells in Virginia. The amount ranges from slightly less than one cent per cigarette in 1999 to almost two cents per cigarette in the year 2007 and thereafter, adjusted for inflation. *Id.* § 3.1-336.2.A.2. Any nonparticipating tobacco manufacturer failing to comply with the duties imposed by the qualifying statute becomes subject to a civil fine and ultimately to loss of the privilege of selling cigarettes to consumers in Virginia. *Id.* § 3.1-336.2.C.

The escrow fund established by the statute is to be used to pay any judgment or settlement in a lawsuit brought by Virginia to recover on a claim (of the kind released in the Master Settlement Agreement) against a nonparticipating manufacturer. Otherwise, the escrow funds are returned to the nonparticipating manufacturer either annually to the extent that they exceed what that manufacturer would have paid had it participated under the Master Settlement Agreement or completely after 25 years. In the interim, all interest earned on the escrow account is paid to the manufacturer. Va. Code Ann. § 3.1-336.2.B.

Star Scientific, a "technology-oriented" tobacco company that focuses on developing tobacco-processing technology to reduce certain cancer-causing toxins in tobacco leaf and tobacco smoke, began operations in 1990. It did not participate in the Master Settlement Agreement because of the financial burden of the required payments. The company estimated that under the agreement, it would have to pay approximately $19.8 million during 2000 and more thereafter. It asserts that it never engaged in the misconduct alleged against the major manufacturers by the States, and it was never sued by the States. Accordingly, Star Scientific elected — albeit under duress — to comport with the requirements of the qualifying statutes. It deposited approximately $11.6 million in escrow in April 2000, approximately $409,000 of which was attributable to the sale of cigarettes in Virginia under Virginia's qualifying statute.

Because of the substantial payments required by the States' various qualifying statutes, Star Scientific commenced this action, seeking to have Virginia's qualifying statute declared unconstitutional and enjoined. It alleged in its complaint that the statute deprives Star Scientific of its rights under the Due Process, Equal Protection, Commerce, and Takings Clauses of the United States Constitution. It also challenged the Master Settlement Agreement, arguing that the agreement is an unconstitutional interstate compact because it has not received congressional authorization, as required by the Compact Clause of Article I, § 10 of the Constitution.

On Virginia's motion, made under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed Star Scientific's complaint. The court ruled that Star Scientific lacked standing to challenge the Master Settlement Agreement under the Compact Clause because Star Scien-

tific could not allege an injury that was "concrete and particularized," nor could it show any legal prejudice caused by the Master Settlement Agreement. The court recognized that Star Scientific had standing to challenge Virginia's qualifying statute, but it dismissed all of Star Scientific's constitutional challenges to the statute for failure to state a claim on which relief could be granted.

From the district court's judgment dismissing the complaint, Star Scientific filed this appeal. Star Scientific did not, however, appeal the district court's ruling on its Takings Clause claim.

## II

Star Scientific contends first that Virginia's qualifying statute — Va. Code Ann. §§ 3.1-336.1 & 3.1-336.2 — violates its rights under the Due Process Clause. It argues that the statute unconstitutionally aims effectively to neutralize the economic impact of the Master Settlement Agreement on the participating manufacturers by placing equivalent financial burdens on the nonparticipating manufacturers, who are competitors of the participating manufacturers. The statute accomplishes this end, they argue, by depriving nonparticipating competitors, such as Star Scientific, of their property for 25 years either to force them to sign the Master Settlement Agreement or to impose on them a competitive disadvantage that they otherwise would not have suffered because they engaged in no wrongdoing.

Star Scientific focuses on two legislative means which it asserts are illegal. First, it contends that the State deprives Star Scientific of its property without due process of law by forcing it to pay its funds into an escrow account for 25 years, citing to *Eastern Enterprises v. Apfel*, 524 U.S. 498, 547 (1988) (Kennedy, J., concurring in judgment and dissenting in part); *id.* at 556-57 (Breyer, J., dissenting); *North Ga. Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 606 (1975). Second, it contends that Virginia seeks to compel it to sign an agreement settling a case to which it was not a party and for which it could not be made a party. Star Scientific contends that in an effort to force non-signing parties to join the Master Settlement Agreement, Virginia disadvantages nonparticipating manufacturers such as Star Scientific because their payments in escrow are not tax deductible. It asserts that this purpose is impermissible because it is unconstitutional for "an

agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights" (quoting *United States v. Goodwin*, 457 U.S. 368, 372 n.4 (1982) (internal quotation marks and citation omitted)).

In response, Virginia argues that the qualifying statute is designed to protect the physical and fiscal health and welfare of the Commonwealth and thus is a constitutionally sound exercise of the State's police powers. The Commonwealth asserts that the statute serves the expressly stated legitimate purpose of providing a source of recovery for the smoking-related healthcare costs that it will inevitably be forced to bear. It concludes that, under rational basis review, the existence of this legitimate purpose ends the due process inquiry. The district court agreed with the Commonwealth and dismissed Star Scientific's due process claim.

"In reviewing a district court's order dismissing a complaint under Federal Rule of Civil Procedure 12(b)(6) for plaintiff's 'failure to state a claim upon which relief can be granted,' we determine *de novo* whether the complaint, under the facts alleged and under any facts that could be proved in support of the complaint, is legally sufficient." *Eastern Shore Mkts., Inc. v. J.D. Assoc. Ltd. Partnership*, 213 F.3d 175, 180 (4th Cir. 2000).

The Due Process Clause includes a substantive component that provides some protection against economic legislation interfering with property interests. *See*, *e.g.*, *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal.*, 508 U.S. 602, 636-37 (1993); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 14-15 (1976). This protection, however, is severely limited. The Supreme Court has long recognized that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industry conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 488 (1955); *see also Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws").

To comport with the limited scope of substantive due process protection, economic legislation need only be rationally related to a legitimate government interest. *See*, *e.g.*, *Concrete Pipe*, 508 U.S. at 637; *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 84 (1978); *Holland v. Keenan Trucking Co.*, 102 F.3d 736, 740 (4th Cir. 1996) ("If a piece of economic legislation 'is supported by a legitimate legislative purpose furthered by [a] rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches'") (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984)). Under rational basis review, therefore, "there is no need for mathematical precision in the fit between justification and means," *Concrete Pipe*, 508 U.S. at 639, and "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Lee Optical*, 348 U.S. at 487-88. Moreover, economic legislation "come[s] to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery*, 428 U.S. at 15. Thus, "[i]t is difficult to exaggerate the burden" that a party must overcome to demonstrate that economic legislation fails rational basis review. *Holland*, 102 F.3d at 740.

The courts defer to rational legislative decisionmaking with respect to economic legislation because the legislatures are better equipped to consider and evaluate the "profound and far reaching consequences" that such legislation may have. *Duke Power Co.*, 438 U.S. at 83. Thus, the Supreme Court has admonished that "it is for the legislature, not the courts, to balance the advantages and disadvantages" of economic legislation. *Lee Optical*, 348 U.S. at 487. This deference is appropriate because the people may "resort to the polls" to protect themselves against abuses by the legislature. *Id.* at 488 (quoting *Munn v. Illinois*, 94 U.S. 113, 134 (1876)).

Now applying this highly deferential standard, we determine whether Star Scientific has demonstrated that the Virginia General Assembly "acted in an arbitrary and irrational way" when it passed its qualifying statute. *See Usery*, 428 U.S. at 15.

The qualifying statute at issue — Va. Code Ann. §§ 3.1-336.1 & 3.1-336.2 — was passed with a fully articulated purpose. In the preamble to the legislation, the Virginia General Assembly stated that cigarette smoking "presents serious public health concerns" which in turn present "serious financial concerns for the Commonwealth." It stated that it was therefore adopting the policy that "financial burdens imposed on the Commonwealth by cigarette smoking be borne by tobacco product manufacturers rather than by the Commonwealth to the extent that such manufacturers either determine to enter into a settlement with the State or be found culpable by the courts." Against these background facts and the policy announced, the Virginia General Assembly articulated the purpose of the qualifying statute, as follows:

> Whereas, it would be contrary to the policy of the Commonwealth if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the Commonwealth will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the Commonwealth to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

In short, the statute's stated purpose is to ensure that Virginia will be able to recover healthcare costs from cigarette manufacturers regardless of whether the manufacturer has signed on to the Master Settlement Agreement. Giving effect to this purpose falls within the State's police power to promote the public health of the State and "do[es] not run afoul of some specific federal constitutional prohibition, or of some valid federal law." *Ferguson*, 372 U.S. at 730-31 (quoting *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536 (1949)). Because the qualifying statute unquestionably has a legitimate purpose, the only viable remaining question is whether the statute is rationally related to furthering this purpose.

The statute requires that tobacco manufacturers who have not signed the Master Settlement Agreement place funds in escrow in

proportion to the number of cigarettes that they sell in Virginia, directly or through intermediaries. The funds are held to secure any claim by the Commonwealth against the manufacturer for health-related claims arising from cigarette smoking. While we recognize the financial burden that such payments might create for any given cigarette manufacturer — a burden represented by the loss of use of significant amounts of money for 25 years — we note that the State surely could properly accomplish the same end by enacting a more financially burdensome form of legislation, such as an act imposing a tax on cigarette manufacturers but giving a tax credit to those who sign the Master Settlement Agreement. Under the escrow arrangement, the manufacturer receives interest currently on the funds in the escrow account and the full principal not used to pay judgments after 25 years. This mechanism is rationally related to the stated purpose of the statute, and beyond that we must leave the weighing of interests and the wisdom of the legislation to the legislature. *See Ferguson*, 372 U.S. at 731 (recognizing the "social utility" of debt adjusting, but nonetheless upholding a law that allowed only lawyers to engage in debt adjusting and, therefore, put out of business nonlawyer debt adjusters). Stated differently, because the creation of the escrow account is rationally related to Virginia's legitimate purpose of ensuring that it can recover future judgments against nonparticipating tobacco manufacturers, we defer to the legislature's judgment that the qualifying statute is the best way of dealing with the possibility of culpable manufacturers becoming judgment proof in the future. *See Duke Power*, 438 U.S. at 83-84 (noting that the fact that the legislation has "profound and far-reaching consequences . . . provides all the more reason for this Court to defer to the congressional judgment unless it is demonstrably arbitrary or irrational").

Star Scientific's challenge to the qualifying statute is based on a rejection of the statute's articulated purpose. It would rather infer that the statute was enacted to coerce cigarette manufacturers to sign on to the Master Settlement Agreement. This argument ignores the fact that even if we were to reject the State's articulated purpose for enacting the statute, we would then need only determine that the legislation has some conceivable purpose that is not prohibited by the Constitution. *See Lee Optical*, 348 U.S. at 487 (considering various purposes on which the legislature "might" have based the legislation at issue); *see also Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 463

n.7 (1981) (noting that, in equal protection analysis, the "Court will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they 'could not have been a goal of the legislation'" (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975))). Obviously, one of the conceivable purposes of the statute is the legitimate purpose stated by Virginia and to which the means adopted rationally relates. Accordingly, we agree with the district court that the qualifying statute does not violate the Due Process Clause of the United States Constitution.

### III

Star Scientific next contends that Virginia's qualifying statute violates its rights under the Equal Protection Clause. It argues that the statute treats tobacco companies differently based on whether or not they joined the Master Settlement Agreement, and that this differential treatment is not rationally related to a legitimate government purpose. Star Scientific asserts first that the statute's purpose is to protect the market share of the four largest cigarette manufacturers and that this protectionist purpose is illegitimate. Second, it argues that even if the purpose of the statute is to ensure a source of recovery for health care costs imposed on Virginia by cigarette smoking, this purpose is not rationally fulfilled by imposing the requirements of the qualifying statute only on nonparticipating members.

In response, Virginia contends that the different classifications of cigarette manufacturers under the qualifying statute are rationally related to the overall purpose of providing a source of recovery for healthcare costs. Just as participating manufacturers are required to make payments under the Master Settlement Agreement for past and future damages, nonparticipating members are required to put money into escrow which is held only for assuring that the nonparticipating manufacturers' future liability is satisfied. In either case, Virginia's future costs resulting from cigarette smoking are placed on the tobacco manufacturers who sell cigarettes in the State.

Like the analysis used in evaluating the constitutionality of economic legislation under the Due Process Clause, an analysis of economic legislation under the Equal Protection Clause is a deferential

one. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Stated otherwise, a statutory classification that neither employs inherently suspect distinctions nor burdens the exercise of a fundamental constitutional right will be upheld if the classification is rationally related to a legitimate state interest. *See*, *e.g.*, *Cloverleaf Creamery*, 449 U.S. at 461; *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). This rational basis review is "a paradigm of judicial restraint." *Beach Communications*, 508 U.S. at 314. Thus, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' Moreover, . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Dukes*, 427 U.S. at 314 (internal citations omitted) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Turning to whether Virginia's qualifying statute violates the Equal Protection Clause, we conclude that Star Scientific has not met its very difficult burden. Although it is true that the qualifying statute creates distinctions among tobacco manufacturers based on whether a manufacturer signs the Master Settlement Agreement, the distinctions are rationally related to Virginia's legitimate purpose of ensuring a source of recovery from *all* manufacturers for Virginia's future costs related to cigarette smoking.

For those manufacturers sued by Virginia for wrongdoing, the Master Settlement Agreement mandates not only strict conduct restrictions but also nonrefundable payments in perpetuity. Manufacturers joining the agreement as Subsequent Participating Manufacturers — those manufacturers who were not sued for wrongdoing — while not required to make the same payments as the original participating manufacturers, nevertheless agree to be bound by conduct restrictions. In contrast, nonparticipating manufacturers are subject to no conduct restrictions, and their payments in escrow last for only 25 years. In addition, these manufacturers receive interest on the funds while they are held in escrow, and the principal is fully refundable if

the money is not needed to pay a judgment in a tobacco-related law-suit. Thus, the refundability of the payments is directly related to the nonparticipating manufacturers' future liability for tobacco-related losses.

Thus, the distinctions between manufacturers signing the Master Settlement Agreement and manufacturers not signing are rationally related to their status *vel non* as defendants, their willingness to agree to conduct limitations, and Virginia's need to ensure a source of recovery for all future tobacco-smoking related healthcare costs. All manufacturers thus bear responsibility in differing manners and degrees for limiting the State's future liability for these costs. Those manufacturers who have not admitted to any wrongdoing and who do not wish to limit their future conduct retain the ability to manufacture and market their product in the manner they pursued before, but they essentially provide a surety bond against future liability for tobacco-smoking related healthcare costs.

Under the rational basis review applicable here, we conclude that Virginia's qualifying statute is constitutional. "States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Dukes*, 427 U.S. at 303; *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000) (holding that, under rational basis review, the Equal Protection Clause does not require States "to match age distinctions and the legitimate interests they serve with razorlike precision"). Even though the tobacco manufacturers are treated differently, the differences in treatment are related to their different circumstances, allowing the State to accomplish its legitimate purposes. "[W]e will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purpose that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). This deference that we give Virginia's legislative decisions recognizes that "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Lee Optical*, 348 U.S. at 489 (internal citations omitted).

Star Scientific acknowledges that providing a source of recovery for the possible harm caused to the State treasury by cigarettes is a legitimate state purpose. It argues, however, that the distinction in Virginia's qualifying statute between manufacturers who signed the Master Settlement Agreement and those who did not is not rationally related to this purpose or any other legitimate State purpose. It gives several examples.

First, Star Scientific argues that nonparticipating manufacturers are actually treated more harshly under the qualifying statute than are participating manufacturers because nonparticipating manufacturers are required to pay more money and do more to assure against becoming judgment proof in the future than are participating manufacturers. It points to the fact that Subsequent Participating Manufacturers who signed the Master Settlement Agreement within 90 days are not obligated to pay any damages as long as their market share stays within specified bounds. On the other hand, Star Scientific, as a nonparticipating manufacturer, is obligated to pay a fixed amount for each cigarette sold in Virginia regardless of its market position there.

Similarly, Star Scientific notes that the payments made by nonparticipating members under the qualifying statute greatly exceed the equivalent payments made by participating manufacturers to cover future liability. It explains that while *all* of the payments made by nonparticipating manufacturers under the qualifying statute are used to pay for future harms caused to the Commonwealth, only 5% of the payments made by participating manufacturers go to addressing future harms. To support this assertion, Star Scientific refers to the consent decree entered in Virginia's lawsuit against the major manufacturers, which provides that Virginia has determined that 5% of the payments required under the Master Settlement Agreement "shall be apportioned and deemed attributed to the monetary payment" sought in its complaint.

Star Scientific's arguments demonstrate that Virginia's qualifying statute does not treat nonparticipating manufacturers the same as it does manufacturers who subscribed to the Master Settlement Agreement. But the fact that manufacturers in different circumstances are not treated the same does not mean that the distinctions are irrational or so unrelated to a legitimate purpose that they must be struck down

under the Equal Protection Clause. Indeed, the distinctions made by Virginia are rational. Virginia initially made an assessment of those manufacturers who contributed most to its healthcare costs from cigarette smoking, and it sued those manufacturers. Star Scientific was not one of those accused by the Commonwealth and, therefore, was not named a defendant in the litigation. That litigation was resolved against the major manufacturers by the Master Settlement Agreement, under which the manufacturers agreed not only to make payments and pay attorneys fees but also to restrict their conduct. They agreed to limit their advertising and marketing of cigarettes, to limit their lobbying efforts, to disband their industrial associations, and to alter their research policies. These agreements are not insignificant and, indeed, such restrictions might not be enforceable as involuntary governmental bans. Moreover, the payments made to the Commonwealth by the participating manufacturers are not refundable, nor do the manufacturers receive interest on their payments.

The nonparticipating manufacturers, on the other hand, are not required to limit their conduct. Their payments are refundable and earn interest. In addition, they are not required to pay the Commonwealth's attorneys fees.

In short, the distinction between participating manufacturers and nonparticipating manufacturers is rationally related to Virginia's efforts to redress alleged wrongdoing and, at the same time, to assure a future source for covering the costs of cigarette smoking from all tobacco manufacturers.

While the Master Settlement Agreement resolved the litigation between Virginia and the major tobacco manufacturers — those determined by the Commonwealth to be principally responsible for its losses — it also provided an incentive to other manufacturers to participate in the limitations on conduct that the Commonwealth felt were beneficial to it and the citizens of Virginia. Thus, every other manufacturer not sued by the Commonwealth was invited to join the Master Settlement Agreement as a "Subsequent Participating Manufacturer." Such Subsequent Participating Manufacturers were not required to make payments but agreed to limit their conduct. Star Scientific was free to join the Master Settlement Agreement as a Subsequent Participating Manufacturer if it concluded that this would have

been a better deal for it, but, apparently for business reasons, it elected not to participate in that capacity.

Also, the fact that Star Scientific may end up paying relatively more toward *future* healthcare costs than participating manufacturers is directly related to Star Scientific's future liability, which may be higher than that of participating manufacturers because it is not bound by any conduct restrictions. If its liability is not higher, it will receive its escrow payments back, with interest.

In sum, we conclude that the distinctions drawn in Virginia's qualifying statute between tobacco manufacturers participating in the Master Settlement Agreement and those not participating are rationally related to the State's purpose of ensuring a source of recovery from *all* cigarette manufacturers who are held liable for smoking-related healthcare costs. The Commonwealth's decision to require nonparticipating manufacturers to place funds in an escrow account is not "invidious discrimination" or a "wholly arbitrary act." *Dukes*, 427 U.S. at 303-04. Rather, it is a rational system for assessing tobacco manufacturers for the costs of cigarette smoking as well as regulating their conduct to the extent that they were sued and agreed to resolve that suit through settlement. We therefore conclude that the qualifying statute does not violate the Equal Protection Clause.

IV

Star Scientific contends that Virginia's qualifying statute also violates the Commerce Clause, which gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This argument focuses on the aspect of the qualifying statute that assesses an escrow payment amount on each cigarette sold by nonparticipating tobacco manufacturers "within the Commonwealth, *whether directly or through a distributor*, retailer or similar intermediary or intermediaries." Va. Code Ann. § 3.1-336.2.A (emphasis added); *see also id.* § 3.1-336.1 (defining cigarette "units sold" as those sold in the Commonwealth "whether directly or through a distributor, retailer or similar intermediary or intermediaries"). More particularly, Star Scientific argues that the statute requires it to make payments on cigarettes sold by it to independent distributors in other states if the cigarettes are

later sold into Virginia. It maintains that, in this manner, the qualifying statute regulates transactions beyond the Commonwealth's borders and excessively burdens interstate commerce.

In response, Virginia maintains that its qualifying statutes regulate only the sale of cigarettes *in Virginia*. It contends that any incidental burden placed on interstate commerce by operation of the statute is outweighed by Virginia's strong interest in assuring its ability to recover the costs of tobacco use imposed on it by cigarette manufacturers.

The constitutional grant of authority to Congress to regulate interstate commerce "has long been understood, as well, to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted.'" *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 (1994) (quoting *Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945)). This "negative command, known as the dormant Commerce Clause," prohibits States from legislating in ways that impede the flow of interstate commerce. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). The dormant Commerce Clause's limitation on State power, however, "is by no means absolute. In the absence of conflicting federal legislation the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27, 36 (1980).

To determine whether a State statute violates the dormant Commerce Clause, we conduct a two-tiered analysis. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986); *Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," the statute is generally struck down "without further inquiry." *Brown-Forman*, 476 U.S. at 579. Thus, for State statutes that discriminate against interstate commerce, we apply "a virtually *per se* rule of invalidity." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992). When, however, a statute does not discriminate against interstate commerce

but rather "regulates evenhandedly and only indirectly affects interstate commerce," we conduct a fuller analysis — the second tier — involving a balancing test. *See Environmental Technology Council*, 98 F.3d 785; *see also Brown-Forman*, 476 U.S. at 579. In conducting this second-tier analysis, we look to "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman*, 476 U.S. at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Star Scientific argues first that the qualifying statute is invalid *per se* because it directly regulates commerce occurring wholly outside of Virginia's boundaries. It maintains that "a State violates the Commerce Clause if it attempts to regulate aspects of the stream of commerce that occur upstream, outside the State's borders." It correctly notes that a State may not regulate commerce occurring wholly outside of its borders. *See Edgar v. Mite Corp.*, 457 U.S. 624, 642-43 (1982) (noting that "[t]he Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"); *Brown-Forman*, 476 U.S. at 582-83; *Healy v. Beer Inst.*, 491 U.S. 324, 335-36 (1989). Nor may a State pass laws that have "the 'practical effect' of regulating commerce occurring wholly outside the State's borders." *Healy*, 491 U.S. at 332. This proposition is based on the common sense conclusion that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority," regardless of the State's legislative intent. *Healy*, 491 U.S. at 336. Star Scientific maintains that Virginia's qualifying statute is analogous to the statutes held unconstitutional in *Brown-Forman* and *Healy*.

In *Brown-Forman*, the Supreme Court struck down a provision of the New York Alcoholic Beverage Control Law that required liquor distillers to affirm that their prices were no higher than the lowest price at which the same product would be sold in any other state during the month. 476 U.S. at 575-76. The Court found that, while the law was addressed only to the sale of liquor in New York, "the 'practical effect' of the law [was] to control liquor prices in other States" because "[o]nce a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month." *Id.* at 582-83. Thus, the Court found the law invalid

because "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id.* at 582.

In the same vein, the Court in *Healy* struck down the Connecticut Liquor Control Act which required out-of-state beer shippers to affirm that the prices at which their products were sold to Connecticut wholesalers were no higher than the prices at which those same products were sold in bordering states. 491 U.S. at 326-27. The Court held the statute unconstitutional because it had the practical effect of controlling liquor prices in other States and interfered with the regulatory schemes in those States. *Id.* at 338-39.

Virginia's qualifying statute, however, rather than aiming at or reacting to commerce outside of Virginia, specifically limits its applicability to the sale of cigarettes "within the Commonwealth." Va. Code Ann. § 3.1-336.2.A; *see also id.* § 3.1-336.1 (defining "units sold" as "individual cigarettes sold in the Commonwealth"). Thus, rather than regulate "upstream transactions" outside of the State, the Virginia qualifying statute imposes a fee only for cigarettes actually sold within the State. It has no effect on transactions undertaken by out-of-state distributors in other States.

To the extent that the statute may affect the prices charged by out-of-state distributors, the effect is applicable only to prices charged on cigarettes sold within Virginia. The statute does not insist on price parity with cigarettes sold outside of the State. The statute therefore does not have the "practical effect" of controlling prices or transactions occurring wholly outside of the boundaries of Virginia, as was the case in *Brown-Forman* and *Healy*. Thus, the rule of *per se* invalidity does not apply to the qualifying statute.

Star Scientific argues that in any event, Virginia's qualifying statute fails the balancing test applicable to State economic regulations that indirectly affect interstate commerce. It asserts that the burden that the qualifying statute places on interstate commerce clearly exceeds its local benefits.

The balancing test applicable to nondiscriminatory legislation affecting interstate commerce was set out in *Pike*, 397 U.S. at 142:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

(internal citation omitted). To apply this *Pike* balancing test, we consider (1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is "clearly excessive" when weighed against these local benefits. *Id.*

As we discussed in Parts II and III, above, Virginia's qualifying statute serves the legitimate state interest of ensuring that Virginia has a source of recovery for future smoking-related healthcare costs attributable to tobacco manufacturers who have not subscribed to the Master Settlement Agreement and who, therefore, are not already compensating the Commonwealth for these healthcare costs. Thus, the putative local benefits are both legitimate and important. We also conclude that the burden of the State's economic regulation on interstate commerce is minimal.

Star Scientific argues, however, that because the escrow payments are imposed on cigarettes sold not only by it, but also by its distributors, even when the distributors purchased the cigarettes outside of the State, Star Scientific is required to "police interstate sales or channel those sales into contractual forms that may be more burdensome to commerce." Star Scientific is, however, overstating its burden. As Virginia points out, distributors in Virginia are already required to record the number of cigarettes they stamp with the Virginia excise stamp and report that information to the Commonwealth. *See* Va. Code Ann. § 58.1-1000 *et seq.* Because distributors already have to keep track of this information, any additional burden caused by requiring manufacturers to obtain this information from the distributors is minimal.

Given the important State interest advanced by the qualifying statute and the minimal burden placed on interstate commerce by its operation, we conclude that the burden on interstate commerce is not "clearly excessive" when compared to the putative local benefits. *See Pike*, 397 U.S. at 142. Thus, we agree with district court that the qualifying statute does not violate the Commerce Clause.

V

Finally, Star Scientific challenges the Master Settlement Agreement itself, contending that it violates the Compact Clause of Article 1, § 10, of the Constitution, which provides that "no State shall, without the consent of Congress, . . . enter into any Agreement or Compact with another State." U.S. Const. art. I, § 10, cl. 3. Star Scientific asserts that the Master Settlement Agreement is in fact an interstate compact and that, because it has not been approved by Congress, the Agreement, as well as the qualifying statutes enacted pursuant to it, are invalid.

Virginia contends that Star Scientific lacks standing to challenge the Master Settlement Agreement, a settlement to which it is not a party. It argues that because invalidating the Master Settlement Agreement would not release Star Scientific from its obligations under the qualifying statute, the purported injury that Star Scientific claims from having to pay into the escrow fund under the qualifying statute is not redressable by its challenge to the Master Settlement Agreement. On the merits, Virginia argues that the Compact Clause is, in any event, not applicable to the Master Settlement Agreement because the agreement does not enhance the political power of Virginia or any other State in a way that encroaches upon the supremacy of the United States. In addition, Virginia asserts that Congress has implicitly, if not expressly, provided any consent that might be needed. *See Cuyler v. Adams*, 449 U.S. 433, 441 (1981) (recognizing implied consent given in a statute enacted prior to the formation of an interstate compact); *Virginia v. Tennessee*, 148 U.S. 503, 521-22 (1893) (recognizing implied consent to a Border Agreement by treating Border as valid for subsequent revenue, electoral, and judicial purposes); *Greene v. Biddle*, 21 U.S. (8 Wheat.) 1, 86-87 (1823) (recognizing implied consent given by admitting State into the Union). In support of this argument, Virginia points to Congress' amendment to

the Medicaid statute in 1991, in which Congress authorized the States to use Master Settlement Agreement funds "for any expenditures determined appropriate." Specifically, the amendment provided that federal rules governing health overpayments "shall not apply to any amount recovered or paid to a State as part of the comprehensive settlement of November 1998 between manufacturers of tobacco products . . . and State Attorneys General." 42 U.S.C. § 1396b(d)(3)(B)(i-ii) (Supp. V 1999).

The district court agreed with Virginia and did not reach the merits of the Compact Clause argument. We will address both the standing and the merits issues, *seriatim*.

A

Article III of the Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies." U.S. Const. art. III, § 2. Thus, it is a jurisdictional requirement that a person challenging a government action be a party to a live case or controversy. This standing requirement "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To establish standing, a party must establish, as "the irreducible constitutional minimum," three elements: (1) that it has suffered an injury in fact that is both concrete and particularized and "actual or imminent, not conjectural or hypothetical"; (2) that there is a causal connection between the injury and the conduct complained of, i.e. the injury is "fairly traceable" to the challenged action; and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Id.* at 560-61 (internal quotation marks and citations omitted); *Burke v. City of Charleston*, 139 F.3d 401, 405 (4th Cir. 1998).

In this case, Star Scientific contends that its payments into escrow pursuant to Virginia's qualifying statute impose an actual and concrete injury that is "fairly traceable" to the Master Settlement Agreement because the Master Settlement Agreement coerced the Commonwealth to enact the qualifying statute that causes Star Scientific's injury. Accordingly, it argues, its injury will be redressed by a favorable decision invalidating the Master Settlement Agreement.

Virginia contends, however, that instead of requiring the States to enact escrow statutes, the Master Settlement Agreement only *encourages* the enactment of such statutes. It asserts that every settling State retains "full freedom *not* to pass the 'contemplated' law, and a State that chooses not to do so remains a full party to the Master Settlement Agreement." If a state does not enact a qualifying statute, the tobacco companies remain released from liability for past and future claims and the States receive the benefit of the conduct restrictions imposed on the tobacco companies by the agreement. In addition, in certain peculiar circumstances a State that fails to enact a qualifying statute might still receive some payments.

Star Scientific acknowledges that there is not a complete dependency between the Master Settlement Agreement and the qualifying statute, but it maintains it has standing to challenge the Master Settlement Agreement because the agreement is powerfully coercive. The Master Settlement Agreement, it argues, "provides enormous financial incentives for the Commonwealth to adopt the Qualifying Statute and imposes large penalties if the statute is repealed." We agree with Star Scientific.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court was presented with a similar situation and found sufficient coercion to form the basis for standing. In that case, the plaintiffs challenged a Biological Opinion issued by the Fish and Wildlife Service, claiming that the allocation of water required by the Opinion affected the amount of water available to the plaintiffs. *Id.* at 167-68. The government argued that the harm asserted by the plaintiffs was not caused by the Biological Opinion because the Bureau of Reclamation was an intervening actor determining whether to implement the requirements of the Opinion. *Id.* at 168. The Supreme Court rejected this argument and concluded that while the Bureau was "technically free to disregard the Biological Opinion . . . it [did] so at its own peril" and faced substantial penalties if it ignored the opinion. *Id.* at 170. In these circumstances, the Court concluded that the plaintiffs' injuries were fairly traceable to the Biological Opinion despite the intervening action of the Bureau of Reclamation.

Similarly, the Master Settlement Agreement, while not technically *requiring* Virginia to enact a qualifying statute, nevertheless imposes

a powerful incentive for it to do so. Virginia would suffer large penalties if it failed to enact the statute. For example, if the participating manufacturers were to lose market share and their loss was attributable to their payments under the Master Settlement Agreement and to the nonparticipating manufacturers' freedom from such payments, the "Firm" (the administrative body created under the Master Settlement Agreement) could determine that this loss was caused by Virginia's failure to enact a qualifying statute and, on that basis, decrease Virginia's payments from the manufacturers under the agreement. Because Virginia could face a substantial financial burden if it were not to enact a qualifying statute, the Master Settlement Agreement is coercive in requiring the states to pass such a statute. We conclude that this coercion is significant and that, therefore, Star Scientific's injuries may be fairly traceable to the requirements of the Master Settlement Agreement. Accordingly, we conclude that Star Scientific has standing to challenge the Master Settlement Agreement under the Compact Clause.

B

The Compact Clause does not require congressional approval of every agreement between or among States. Instead, the Supreme Court has held that "the proper balance between federal and state power with respect to compacts and agreements among states" is maintained by limiting application of the Compact Clause to agreements that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893); *see also Northeast Bancorp., Inc. v. Board of Governors of the Fed. Res. Sys.*, 472 U.S. 159, 175-76 (1985); *United States Steel Corp. v. Multi-State Tax Comm'n*, 434 U.S. 452, 471 (1978); *New Hampshire v. Maine*, 426 U.S. 363, 369 (1975).

The Master Settlement Agreement principally operates vertically between each State and the signatory tobacco companies, providing releases from liability to the tobacco companies in exchange for conduct restrictions and payments. But in administering the amount of payments under the Master Settlement Agreement and their relationship to the escrow accounts established under qualifying statutes, the

Master Settlement Agreement creates an administrative body — the Firm, consisting of economic consultants — to determine compliance with the Master Settlement Agreement. To the extent that the States agree on the creation of this single administrative body and its functioning, there is a horizontal aspect to the Master Settlement Agreement that establishes a compact among the States, implicating the Compact Clause.

Although the Master Settlement Agreement implicates the Compact Clause, we see no reason to conclude that it encroaches on federal power. In *Multi-State Tax Commission*, the Supreme Court upheld a compact resulting in reciprocal State legislation and establishing an administrative body to coordinate State taxation of certain entities. 434 U.S. at 472-73. The Court noted that the compact might result in an increase in bargaining power of the member States with respect to the corporations subject to their taxing jurisdictions, but it found such an increase in power to be acceptable because "the test is whether the Compact enhances state power *quoad* the National Government." *Id.* at 473. Similarly, the Master Settlement Agreement may result in an increase in bargaining power of the States vis-a-vis the tobacco manufacturers, but this increase in power does not interfere with federal supremacy because the Master Settlement Agreement "does not purport to authorize the member States to exercise any powers they could not exercise in its absence." *Multi-State Tax Comm'n*, 434 U.S. at 473.

In addition, the Master Settlement Agreement does not derogate from the power of the federal government to regulate tobacco. Sections X and XVIII(a) of the agreement specifically anticipate that Congress may, in the future, pass laws regulating tobacco and provides for adjustments of the Master Settlement Agreement's terms if that occurs. Similarly, Star Scientific's argument that the Master Settlement Agreement derogates from the federal bankruptcy policy is without merit. Again, Section XVIII(w)(1)(c) of the Master Settlement Agreement, dealing with bankruptcy, specifically states that the provision is only enforceable if consistent with the Bankruptcy Code.

In sum, we conclude that the Master Settlement Agreement does not increase the power of the States at the expense of federal suprem-

acy and that, therefore, it is not an interstate compact requiring congressional approval under the Compact Clause.

## VI

Today, it is generally recognized that "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *Lorillard Tobacco Co. v. Reilly*, 121 S. Ct. 2404, 2430 (2001) (internal quotation marks and citation omitted). The costs attributable to this major public health issue are borne by various constituencies, including the States. Through years of lawsuits and settlement agreements, the States and the major tobacco companies have finally reached an agreement broadly addressing the public health threat, and this agreement, if it is to be effective, necessarily has implications beyond the parties, reaching nonsettling tobacco companies, such as Star Scientific.

Regardless of Star Scientific's innocence in any alleged wrongdoing — allegations that made the Master Settlement Agreement with the major manufacturers possible — Star Scientific remains a tobacco company whose products continue to threaten the public health. For that reason alone, its inclusion in a legislative scheme to establish financial responsibility for this public health issue is not inherently irrational. Indeed, it falls squarely within the States' police power to promote the public health, safety, welfare, and morals of the State. *See Berman v. Parker*, 348 U.S. 26, 32 (1954).

Star Scientific might rightly claim innocence as to past wrongdoing and might even be justified in claiming credit for its efforts to educate would-be smokers about the adverse effects of smoking and for its efforts to reduce, through research, cancer-causing toxins in cigarettes. But it cannot deny that it is a cigarette manufacturer whose products will continue to threaten the public health. While it does not suggest any such denial, it nevertheless persists in its particular claim that the entire arrangement created by the Master Settlement Agreement and qualifying statutes effects an improper and unjust transfer of large amounts of money from cigarette manufacturers to settling States while openly protecting the profits of the alleged wrongdoers. It characterizes this claim as follows:

> Such naked rent-seeking legislation to protect the position of politically favored actors usually comes cloaked in the sheep's clothing of some legitimate state purpose to which the regulation bears a plausible relation. And in the dim light of rational basis review, this often-transparent disguise is good enough.

> "But this wolf comes as a wolf," *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J. dissenting), because the MSA states that the "Qualifying Statute" must "effectively and fully neutralize[ ] the cost disadvantages that the Participating Manufacturers experience vis-a-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of this Agreement." Whether viewed under the lens of due process or equal protection, that purpose is constitutionally impermissible. The Constitution simply does not allow a State to protect its judgment creditors by imposing financial burdens on their competitors who have not been found liable to the State.

This viewpoint, however, fails to account fully for the larger continuing problem to which Star Scientific necessarily and unquestionably contributes. It also fails to recognize the justifications for the meaningful distinctions in the treatment of the major tobacco manufacturers, who were targeted with alleged wrongdoing, and the smaller tobacco companies, such as Star Scientific, who were not, but yet still threatened the public health.

Not only are the major tobacco manufacturers' payments of over $200 billion irrevocable and without interest, their conduct in associating with each other, in advertising, in marketing, and in researching tobacco products is permanently restricted. These manufacturers also have agreed to reimburse the States for their attorneys fees. Even though nonparticipating tobacco manufacturers, such as Star Scientific, are required to pay comparable amounts into an escrow fund, such payments earn interest for the manufacturer, and the principal is returned after 25 years if the company does not incur tobacco-related liability. If Star Scientific had found these differences in treatment unfair, it was free to participate in the Master Settlement Agreement as a Subsequent Participating Manufacturer. While this choice may

not have been an ideal one for Star Scientific and either option would surely burden its operations, the effect of either option is no different than the effect of a tax that might have been imposed to pay for the public health costs. When viewed in this larger context, Star Scientific's claim of irrationality and impermissible discrimination by Virginia cannot be sustained.

For the reasons we have given, we reject Star Scientific's constitutional challenge to the qualifying statute based on the Due Process, Equal Protection, and Commerce Clauses of the United States Constitution, and we likewise reject its challenge to the Master Settlement Agreement under the Compact Clause. The judgment of the district court is accordingly

*AFFIRMED*.