**BRAINERD AREA CIVIC CENTER, et al., Relators,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. C1–92–2474.

Supreme Court of Minnesota.

May 7, 1993.

Daniel W. Schermer, Minneapolis, for relators.

Hubert H. Humphrey, III, Atty. Gen., Thomas K. Overton, Sp. Asst. Atty. Gen., St. Paul, for respondent.

SIMONETT, Justice.

We uphold the constitutionality of a graduated "combined receipts" tax on certain kinds of charitable gambling and affirm the tax court.

Minn.Stat. § 349.212, subd. 6 was enacted in 1989. This statute applies to organizations engaged in legal charitable gambling and imposes a graduated tax on "combined receipts" derived from tipboard and pull-tab games in a given year.[1] There is no tax levied on an organization's first $500,000 in gross income or receipts; thereafter, a 2–percent tax is levied on gross receipts from $500,000 to $700,000. From $700,000 to $900,000 the tax is $4,000 plus 4 percent of the amount over $700,000 but not over $900,000, and above $900,000 the tax is $12,000 plus 6 percent of the amount over $900,000.

Relators are charitable organizations operating pull-tab and tipboard games.[2] Having paid the "combined receipts" tax for the years in question, relators now seek a refund, claiming the tax is unconstitutional. The tax court ruled to the contrary, and the charitable organizations now bring the matter here on certiorari.

Relators' claim is that the combined receipts tax is unconstitutional "because it is a graduated gross receipts tax." They rely on a 1935 United States Supreme Court decision, *Stewart Dry Goods Co. v. Lewis*, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054 (1935), which held that a Kentucky graduated gross receipts tax was unconstitutional because it violated the federal equal protection clause. In 1939, this court followed *Stewart* in *National Tea Co. v. State*, 205 Minn. 443, 286 N.W. 360 (1939), *vacated and remanded*, 309 U.S. 551, 60 S.Ct. 676, 84 L.Ed. 920, *aff'd on remand*, 208 Minn. 607, 294 N.W. 230 (1940), by striking down a similar tax. The question before us, then, is whether *Stewart* is controlling, *i.e.*, whether the graduated gross receipts tax for pull-tabs and tipboards is the same kind of tax that was deemed constitutionally flawed in *Stewart* and *National Tea*.

In *Stewart*, the State of Kentucky had imposed a graduated gross receipts tax on all retailers, regardless of the type of merchandise they sold, their profit margin, or any other considerations. A levy of 1⁄20th of a percent was imposed on the first $400,000 in gross sales, and progressively higher levies on each additional $100,000 in sales, up to a full 1 percent on amounts over $1,000,000. The Court stressed that the tax was essentially a revenue measure based on the premise that the higher the gross receipts of a business, the greater the likelihood of increased profits, and, consequently, an increased ability to pay more taxes. The Court concluded, however, that higher sales did not necessarily result in

---

1. "Combined receipts" are defined in the statute as "the sum of the organization's gross receipts from lawful gambling less gross receipts directly derived from the conduct of bingo, raffles, and paddlewheels * * *." This definition effectively subjects only gross receipts from pull-tabs and tipboards to the tax.

2. Only an "organization" recognized under the charitable gaming law may operate pull-tabs, tipboards, paddlewheels, and bingo. An "organization" is defined as "any fraternal, religious, veterans, or other nonprofit organization." Minn.Stat. § 349.12, subd. 28 (1992).

higher profits, certainly not on any uniformly progressive basis.[3]

While the *Stewart* holding has been criticized[4] and has engendered somewhat checkered progeny,[5] the decision itself has remained intact all these years. In *National Tea Co. v. State, supra,* this court pointed out that Minnesota's graduated gross receipts tax on chain stores divided chain store merchants into 11 different classes based upon their volume of gross sales and imposed a different rate upon each class. *Id.,* 205 Minn. at 445, 286 N.W. at 361. Concluding the tax was a levy on the privilege of doing business, our court found that the amount of the tax bore no reasonable relation to the value of the privilege. *Id.,* 205 Minn. at 448, 286 N.W. at 362. The tax, we said, was practically identical to the tax in *Stewart* and was, therefore, unconstitutional. *Id.,* 205 Minn. at 450, 286 N.W. at 363.

■ Historically, courts have begun their constitutional analysis of a particular tax by defining it as either an income tax, an occupation or excise tax, a sales tax, or a property tax. A progressive income tax, with both the amount and the rate of the tax increasing with income, is permissible because based on ability to pay. A property tax, on the other hand, tends to be based on the value of the property taxed. A tax on gross receipts can be difficult to label, especially if graduated. *California Co. v. State,* 141 Colo. 288, 298–300, 348 P.2d 382,

388–89 (1959). It looks like an excise tax (a tax on the privilege of engaging in a particular occupation), yet the progressive gradations of the tax suggest that income generated by the gross receipts is also a factor. Our search, then, is not for a label, but rather to understand the distinctions created by the graduated classification scheme and to consider the genuineness and relevance of those distinctions. We might add that in tax legislation, when lines are drawn to classify taxpayers, it is enough if the lines are based on any reasonable, albeit approximate, measurement. *Hegenes v. State,* 328 N.W.2d 719, 722 (Minn.1983).

■ Here, plaintiffs assert that any graduated gross receipts tax is *per se* unconstitutional. Presumably, plaintiffs have in mind Justice Cardozo's dissent in *Stewart* wherein he characterized the Court's majority as "holding that a tax upon gross sales, if laid upon a graduated basis, is always and inevitably a denial of the equal protection of the laws, no matter how slight the gradient or moderate the tax." *Stewart,* 294 U.S. at 566, 55 S.Ct. at 532. Subsequent cases seem to have treated this Cardozo characterization as containing some hyperbole. Thus some state courts have concluded that in certain situations a graduated gross receipts tax does not run afoul of *Stewart.* *See,* footnote 5, *supra.* In any event, we do not concern ourselves with the continued vitality of *Stewart;* it is

---

**3.** The court observed that "the gross sales of a merchant do not bear a constant relation to his net profits; that net profits vary from year to year in the same enterprise; that diverse kinds of merchandise yield differing ratios of profit; and that gross and net profits vary with the character of the business as well as its volume." *Stewart,* 294 U.S. at 558–59, 55 S.Ct. at 528–29.

**4.** Justice Cardozo wrote a dissent in *Stewart,* which has received favorable comment, arguing that it is reasonable to believe that capacity to pay increases with an increase in receipts. *Stewart,* 294 U.S. at 570, 55 S.Ct. at 533. *See, e.g.,* R.C. Brown, *Constitutional Limitations on Progressive Taxation of Gross Income,* 22 Iowa L.Rev. 246, 264–67 (1937).

**5.** Cases following *Stewart* and invalidating a graduated gross receipts tax include *Volusia County Kennel Club v. Haggard,* 73 So.2d 884 (Fla.1954) (tax on dog racetrack receipts) and

*Merit Oil of New York, Inc. v. New York State Tax Commission,* 111 Misc.2d 118, 443 N.Y.S.2d 604 (1981) (tax on oil retailers imposed for sales of all products, including gas, gum, soda, cigarettes, etc.).

On the other hand, *Stewart* has been distinguished and not applied in cases where the tax has many of the attributes of a graduated gross receipts tax. *See, e.g., California Co. v. State,* 141 Colo. 288, 348 P.2d 382 (1959) (graduated tax rates on the extraction and sale of crude oil held constitutional); *Welch v. Henry,* 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938) (allowing a graduated gross income tax less an arbitrary deduction of $750); *Paducah Automotive Trades Ass'n v. City of Paducah,* 307 Ky. 524, 211 S.W.2d 660 (1948) (graduated tax on volume of gross receipts of trade or occupation upheld); and *Homestake Mining Co. v. Johnson,* 374 N.W.2d 357 (S.D.1985) (holding constitutional what was effectively a graduated tax on extraction and sale of minerals).

enough for our purposes here that this case is clearly distinguishable from *Stewart*.

Here the graduated gross receipts tax is being applied to a class of taxpayer and to a type of transaction easily distinguishable from those present in *Stewart* and *National Tea*. What we have here are charitable organizations engaged in legalized gambling, two areas where the state has traditionally paid particularly close attention. These nonprofits do not exist to compete in the same sense as do profit-seeking businesses. To put it another way, although sometimes lost sight of, nonprofit charitable organizations do not exist to sell pull-tabs and tipboards; rather, legalized gaming is simply one of many fundraising options, an option which has been specially sanctioned by the state to allow nonprofits an additional opportunity to raise money for their primary function of service to their communities. The state does more than just license the sale of a chance to win on a pull-tab; it also takes a direct regulatory role in the relationship of gross receipts to profitability, as well as in specifying the appropriate uses for the proceeds. Thus, "[a]n organization's net profits from gambling (gross receipts minus prizes) can be used only for three things: payment of expenses, payment of gambling taxes and contributions for 'lawful purposes.'" Minn. House of Rep. Research Dept., *Charitable Gambling in Minnesota* 5 (rev. ed. Oct. 1989). The expenses that may be deducted are defined by the Gambling Control Board; and, by law, no more than 50 percent of gross profit from pull-tabs and tipboards may be expended for allowable expenses. Minn.Stat. § 349.15 (1992). The "lawful purposes" for which net profits may be spent are also defined. Minn.Stat. § 349.12, subd. 25 (1992).

In light of the charitable nature of the gambling organizations here and the state's interest in tight administrative controls over gambling generally, there is a reasonable relationship between the gross receipts and tax rates applied to each subclass defined by this tax, unlike *Stewart*. There, the tax was levied on for-profit, heterogeneous retailers selling a wide assortment of products at varying prices in classic business competition differing significantly from the "combined receipts" tax challenged here.

In *Stewart*, the Court worried that the graduated gross receipts tax impeded commerce. In this case, however, one of the announced purposes of the graduated gross receipts tax is precisely "to prevent commercialization." Significantly, the opening section of the charitable gambling chapter states that the purpose of sections 349.11 to 349.22 is "to regulate lawful gambling to prevent its commercialization, to insure integrity of operations, and to provide for the use of net profits only for lawful purposes." Minn.Stat. § 349.11 (1992).

This regulatory feature of the "combined receipts" tax is another important distinction. In none of the cases invalidating a graduated gross receipts tax called to our attention were any nonrevenue based policy interests advanced as a rationale for their imposition. Here, however, in addition to raising revenue, it appears another purpose of the combined receipts tax—as important as raising revenue, if not more so—was to put a damper on commercialization of charitable gambling, to avoid the problems of "integrity" which may accompany ever-increasing gambling receipts, and to level the playing field between large and small operations. Large operators, benefiting by economies of scale, are able to offer larger prize pay-outs and to secure better locations for their booths, thereby gaining a competitive advantage over the smaller operators. The progressive feature of the "combined receipts" tax tends to reduce the competitive advantage of the large operators.[6] No one disputes this is a

---

6. "There are over 2,500 organizations licensed in the state to conduct charitable gambling. They vary in size from an organization with over $27 million in gross sales in 1988 to several hundred with under $25,000 in sales. The figures are dominated by a relatively small number of organizations with substantial sales. 159 organizations reported sales of over $1 million and these groups accounted for over one-third of the year's gross receipts even though they represented less than one-tenth of the total licenses issued." Minn. House of Rep. Research

legitimate state purpose; indeed, it appears even more legitimate in light of the fact that the gambling in question is allowed in order to create an additional resource for a variety of charitable organizations, both large and small.

*Volusia County Kennel Club v. Haggard,* 73 So.2d 884 (Fla.1954), deserves a comment because it highlights the distinguishing features of our state's gambling tax. There, the Florida Supreme Court struck down as unconstitutional a graduated tax on the daily gross receipts of dog-racing tracks. As relators point out, the Florida tax was on receipts of a regulated gambling activity, as in our case here. In *Volusia,* however, the dog tracks were operated as for-profit businesses, not as a means of charitable fundraising, and the tax, furthermore, was said to have only a revenue-producing purpose.

 We should also mention another issue raised by relators. The trial court received an affidavit from the Supervisor of Revenue Planning and Research for the Department of Revenue, in which the supervisor stated one of the legislative reasons for enacting the "combined receipts" tax was to level the playing field for large and small operators. Relators say it was error to receive this affidavit. Not so. The affidavit was not offered as evidence of legislative intent to construe a statute's ambiguity (for there is none), but rather to inform the court of some of the various conceivable state interests which may have motivated the legislation. In equal protection analysis, a conceivable and legitimate reason for the legislative classification may provide the rational basis to satisfy the constitutional requirement of equality and uniformity for tax legislation; the affidavit was relevant on that constitutional issue. *See, e.g., Rio Vista Non-Profit Housing Corp. v. Ramsey County,* 335 N.W.2d 242, 245–46 (Minn.1983), *appeal dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

If the "combined receipts" tax survives *Stewart* and *National Tea,* as we so hold, we need carry our equal protection analysis no further. If the tax passes muster under *Stewart* and *National Tea,* it also passes muster under our rational basis test because, as the foregoing discussion demonstrates, the same test is involved. *See, e.g., Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138 (Minn.1980); *Rio Vista Non-Profit Housing Corp. v. Ramsey County, supra.*

The decision of the tax court upholding the constitutionality of the Minnesota Combined Receipts Tax is affirmed.

Affirmed.

Dept., *Charitable Gambling in Minnesota* 9 (rev. ed. Oct. 1989).