COUNCIL OF INDEPENDENT TO-
BACCO MANUFACTURERS OF
AMERICA, et al., Appellants,

v.

The STATE of Minnesota,
et al., Respondents.

No. A03–2020.

Supreme Court of Minnesota.

March 16, 2006.

Rehearing Denied May 16, 2006.

## OPINION

PAGE, Justice.

We are asked to determine the constitutionality of Minn.Stat. § 297F.24 (2004), Minnesota's Cigarette Fee Act (the Act). Appellants, Council of Independent Tobacco Manufacturers of America, Carolina Tobacco Co., and Winner Tobacco Wholesale, Inc. (collectively, appellants), challenge the constitutionality of the Act on three grounds: (1) violation of the First Amendment to the United States Constitution and Article I, Sections 3 and 8, of the Minnesota Constitution; (2) violation of

the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Uniformity Clause of the Minnesota Constitution; and (3) violation of the prohibitions against bills of attainder in the United States and Minnesota Constitutions. The district court and court of appeals upheld the Act against these challenges. We affirm.

I.

In 1994, in *State by Humphrey v. Philip Morris Inc.*, the state and co-plaintiff Blue Cross and Blue Shield sued certain major cigarette manufacturers and trade organizations, asserting claims for monetary, equitable, and injunctive relief.[1] *Id.*, No. C1–94–8565 (Ramsey Cty. Dist. Ct.). The state alleged that the defendants were responsible for health care costs incurred by the state as a result of the defendants' wrongful conduct in deceptively advertising cigarettes and misleading the public about known health risks of smoking cigarettes.

The state settled with one of the defendant manufacturers, Liggett, in 1997 in exchange for its cooperation. In May 1998, the state settled with the remaining defendants (collectively, the Majors). *State by Humphrey v. Philip Morris Inc.*, No. C1–94–8565 (Ramsey Cty. Dist. Ct., *consent judgment entered,* May 19, 1998). The terms of the settlement require the Majors to make six one-time settlement payments to the state and to make additional "annual payments" to the state in perpetuity based, in part, on their annual tobacco sales.[2]

The terms of the settlement also require the Majors to restrict their advertising, lobbying, and litigation activities. With respect to advertising, the Majors agreed to stop transit and billboard advertising of tobacco products in Minnesota, agreed to stop paying for product placement of their cigarettes and for cigarette advertisements in movies, and agreed to stop selling branded and logoed merchandise in Minnesota. With respect to lobbying, the Majors agreed to report to the state any payments made to lobbyists in connection with tobacco products or their use. Finally, the Majors agreed to not oppose the passage of certain legislation intended to reduce tobacco use by children, agreed not to facially challenge the enforceability or constitutionality of existing Minnesota laws and rules relating to tobacco control, and agreed not to support legislation that would preempt, override, or abrogate the state's rights under the tobacco settlement.

Under the settlement, the annual payments to be made by the Majors to the state are to be based, in part, on their annual tobacco sales. But as the Majors raised their prices, presumably to cover the cost of the settlement, predictably they lost market share to other manufacturers

1. The named defendants in the tobacco lawsuit were: Philip Morris Inc.; R.J. Reynolds Tobacco Co.; Brown & Williamson Tobacco Co.; B.A.T. Industries PLC, British–American Tobacco Co. Ltd.; BAT (U.K. & Export) Ltd.; Lorillard Tobacco Co.; The American Tobacco Co.; Liggett Group, Inc.; The Council for Tobacco Research–U.S.A., Inc.; and The Tobacco Institute, Inc.

2. Over the course of a six-year period (1998–2003), the Majors agreed to make payments to the state pro rata to their market share in the following amounts: $240 million—1998; $220.8 million—1999; $242.55 million per year in 2000, 2001, 2002; and $121.55 million in 2003. The Majors also agreed to make annual payments to the state pro rata to their market share on December 31, 1998, and each year thereafter totaling 2.55 percent of $4 billion in 1998; 2.55 percent of $4.5 billion in 1999; 2.55 percent of $5 billion in 2000; 2.55 percent of $6.5 billion in 2001 and 2002; and 2.55 percent of $8 billion in 2003 and thereafter in perpetuity.

who were not subject to the settlement. Although the Majors and Liggett accounted for 98 percent of cigarette sales in 1997, by 2002 their national market share had fallen to about 88 percent. It is presumed that smaller manufacturers who were not parties to the settlement have been able to capture a larger share of the market because of their lower prices.

Thus, the state faced a series of problems. The state claims that health care costs associated with the use of cigarettes not subject to the 1997 tobacco settlement were likely to increase because sales of those cigarettes were increasing, and the state was receiving less from the Majors with which to pay those costs. At the same time, because cigarette consumption by underage smokers is acknowledged to be price-sensitive, the increasing availability of cheaper cigarettes was doing little to discourage underage smoking.

To address these problems, in 2003 the Minnesota legislature enacted Minn.Stat. § 297F.24 (2004), Minnesota's Cigarette Fee Act (the Act). The Act imposes a 35¢ per pack fee on cigarettes distributed in Minnesota after June 30, 2003. But some cigarettes are exempt from the 35¢ payment: cigarettes covered by the settlement between the Majors and the state, and cigarettes produced by other manufacturers that since 1997 have voluntarily entered into agreements with the state. The statute refers to those cigarettes on which the fee is imposed as "nonsettlement" cigarettes. *Id.*, subd. 2. The statute expressly states that the purposes of the fee are to:

(1) ensure that manufacturers of nonsettlement cigarettes pay fees to the state that are comparable to costs attributable to the use of the cigarettes;

(2) prevent manufacturers of nonsettlement cigarettes from undermining the state's policy of discouraging underage smoking by offering nonsettlement ciga-

rettes at prices substantially below the cigarettes of other manufacturers; and

(3) fund such other purposes as the legislature determines appropriate.

*Id.*, subd. 1(b).

Appellants are an organization of cigarette manufacturers, an individual cigarette manufacturer, and a cigarette distributor, none of which were defendants in the initial state tobacco litigation and therefore are not parties to the Minnesota tobacco settlement. To prevent enforcement of the Act, on June 26, 2003, appellants filed a summons and complaint against the state, alleging the Act is unconstitutional. Appellants moved for a temporary restraining order and injunction. The district court denied appellants' motion because it concluded that appellants had not satisfied the *Dahlberg* factors for issuance of a temporary restraining order or temporary injunction. *See Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965).

After the parties stipulated to certain facts, appellants moved for summary judgment. The state also sought dismissal of the case, asserting that the Act does not violate any provisions of the United States or Minnesota Constitutions. The district court granted the state's motion and denied appellants' motion. The district court concluded that appellants had not overcome the presumption of constitutionality that generally accompanies legislative enactments because the Act was "certainly within the purview of the legislature." The court found that, while appellants may not have been accused of wrongdoing, the legislature could impose the fee in the Act because the sale of low-cost cigarettes contributed to underage smoking. The court went on to say that the legislature "has an absolute right and duty to do everything with [sic] the Constitution to discourage

illegal smoking and to discourage people from voluntarily increasing the cost of healthcare for the population in general." According to the court, the Act does not violate either the Equal Protection Clause or the Uniformity Clause because the statute does not create a selective classification; it simply gives tobacco companies the choice to enter into payment agreements with the state to avoid subjecting their products to the fee. The court also rejected the due process, bill of attainder, and First Amendment claims.

The court of appeals affirmed, addressing each of appellants' claims regarding the unconstitutionality of the Act. *Council of Indep. Tobacco Mfrs. of Am. v. State*, 685 N.W.2d 467 (Minn.App.2004). Applying the rational basis standard, the court of appeals concluded that the Act serves a legitimate purpose within the state's power to achieve and that the fee is not a direct attempt to regulate speech; therefore, there was no First Amendment violation. *Council*, 685 N.W.2d at 473.

Second, the court of appeals applied the Minnesota rational basis test and concluded that the Act does not violate the Equal Protection Clause or the Uniformity Clause. *Council*, 685 N.W.2d at 473–74. The court concluded that a reasonable basis exists for distinguishing between settling and nonsettling manufacturers because settling manufacturers make annual payments to the state in perpetuity and nonsettling manufacturers do not. *Id.* at 474. The court also reasoned that the classification in the Act is relevant to the purpose of the law because "[w]ithout the cigarette fee, the non-settling manufacturers avoid assuming responsibility for the hidden costs of smoking and can maintain their prices at a lower level," making smoking more attractive to underage smokers. *Id.* Additionally, the court con-

cluded that the purposes of the Act are neither invidious nor arbitrary. *Id.*

The court of appeals rejected appellants' bill of attainder claim because the court concluded that the Act regulates prospective conduct, rather than punishing past conduct, and is not punitive in nature. *Council*, 685 N.W.2d at 474–75. Finally, the court held that the Act does not constitute special legislation in violation of art. XII, § 1, of the Minnesota Constitution. *Council*, 685 N.W.2d at 475–76. The court reasoned that the legislature may lawfully "create different classes and apply different rules to them so long as the classification is based on substantial distinctions." *Id.* at 475. The court applied our three-part rational basis test and concluded that "the classifications in the statute between settling manufacturers, who pay annual fees that subsidize the costs to the state of smoking and act to raise cigarette prices to discourage youthful smokers, and nonsettling manufacturers, who do not, create a genuine and substantial distinction tied to a legitimate state interest." *Id.* at 475–76.

We address all three of appellants' arguments, beginning with appellants' challenge under the First Amendment, then turning to appellants' challenge under the Uniformity Clause and on equal protection grounds, and finally appellants' challenge to the statute as a bill of attainder. In our analysis, we are reminded of the heavy burden appellants face in seeking to invalidate a statute. We are to invoke every presumption in favor of the constitutionality of the statute, *Reed v. Bjornson*, 191 Minn. 254, 257, 253 N.W. 102, 104 (1934), and are to declare statutes unconstitutional only when absolutely necessary and with extreme caution. *Walker v. Zuehlke*, 642 N.W.2d 745, 750 (Minn. 2002), quoting *Boutin v. LaFleur*, 591 N.W.2d 711, 714 (Minn.1999).

Because appellants have failed to meet this heavy burden with respect to any of the grounds they assert, we conclude that the statute is constitutional.

## II.

■ Appellants first challenge the Act on grounds that it unconstitutionally restricts their First Amendment rights. Appellants assert that the Act unconstitutionally burdens their right to both petition the government for redress of grievances and to advertise, because the Act effectively conditions their right to advertise and to lobby the government on the payments required by the Act.

The restrictions on advertising and lobbying to which appellants object do not appear in the Act itself. Rather, they are part of the Majors' 1998 settlement agreement with the state and the Commissioner of Revenue has stated that, as a matter of policy, they will be incorporated in any later settlements with other tobacco manufacturers.

The parties have stipulated that, under the 1998 settlement agreement, the Majors pay the equivalent of 64¢ per pack. The Act specifies that, if other manufacturers settle with the state, their cigarettes will be subject to a fee of at least 48¢ per pack (75 percent of what the Majors pay) and the settling manufacturers must submit to restrictions on advertising, lobbying, and access the courts as part of the settlements. Further, under the language of the Act, nonsettlement cigarettes are subject to a fee of only 35¢ per pack and nonsettling manufacturers and distributors are not subject to any restrictions on their advertising, lobbying, or ability to litigate.

■ The state cannot deny a benefit on a basis that infringes appellants' constitutionally protected interests, including freedom of speech. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d

570 (1972); *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). But to invoke this "unconstitutional conditions" doctrine, appellants must first show the statute in question in fact denies them a benefit they could otherwise obtain by giving up their First Amendment rights. *See Perry v. Sindermann*, 408 U.S. at 598, 92 S.Ct. 2694 (requiring plaintiff to show on remand that the decision to not renew his contract was, in fact, made in retaliation for his exercise of free speech). Appellants have failed to make this threshold showing.

Appellants argue that, in order to obtain the exemption provided in the Act, they must surrender their rights to advertise, lobby, and access the courts. But this argument ignores the fact that the impact on settlement cigarettes that are exempt under the Act is more per pack than the fee the Act imposes on cigarettes manufactured by appellants. Under the terms of the Minnesota tobacco settlement, as appellants have stipulated, the Majors pay the equivalent of 64¢ per pack. Under the terms of the Act, the cigarettes of manufacturers that voluntarily agree to terms with the state are subject to a fee of at least 48¢ per pack. The statute subjects the cigarettes of appellants to a fee of only 35¢ per pack—little more than half of what the Majors pay—with no restrictions on appellants' right to advertise, lobby, or access the courts. The Act expressly conditions exemption from the 35¢ per pack charge on these payments:

> For purposes of this section, a "nonsettlement cigarette" means a cigarette manufactured by a person other than a manufacturer that:

> (1) is making annual payments to the state of Minnesota under a settlement of the lawsuit styled as State v. Philip Morris Inc., No. C1–94–8565 (Minnesota

District Court, Second Judicial District), if the style of cigarettes is included in the computation of the payments under the agreement; or

(2) has voluntarily entered into an agreement with the state of Minnesota, approved by the attorney general, agreeing to terms similar to those contained in the settlement agreement, identified in clause (1) including making annual payments to the state, with respect to its national sales of the style of cigarettes, equal to at least 75 percent of the payments that would apply if the manufacturer was one of the four original parties to the settlement agreement required to make annual payments to the state.

Minn.Stat. § 297F.24, subd. 2 (2004).

Appellants have not shown they are worse off under the Act if they refuse to renounce their First Amendment rights. Therefore, appellants have not shown that, as a threshold matter, the Act denies them a benefit based on their renouncement of their First Amendment rights.

Nor does the statute here fit the *Speiser/Perry* model. In *Speiser*, the United States Supreme Court addressed the effect of a California statute that required veterans to sign a loyalty oath as a condition of receiving an exemption from property taxes. *Speiser*, 357 U.S. at 516–17, 78 S.Ct. 1332. In contrast to the California statute, the Act does not explicitly reference speech, nor is the stated purpose of the statute to restrict speech. *See* Minn.Stat. § 297F.24, subd. 1(b) (2004) (setting forth the purposes of the fee imposed by the Act). We conclude that, while the Act provides appellants with the opportunity to resolve any possible claims for past misconduct in the sale of their cigarettes by means of a voluntary settlement with the state, it does not coerce or penalize a manufacturer that does not avail itself of that opportunity. Simply put, paying less with no restrictions on First Amendment rights is not coercive and does not constitute a penalty.

Our conclusion comports with the result reached by a federal district court that addressed a First Amendment challenge to the national tobacco settlement. *S & M Brands, Inc. v. Summers*, 393 F.Supp.2d 604 (M.D.Tenn.2005). Under the national tobacco settlement, as a condition of receiving full settlement payments, participating states are required to enact "Qualifying Statutes" that obligate each tobacco product manufacturer to either become a "participating manufacturer" (as defined in the national tobacco settlement agreement) or make payments to an escrow fund. Those manufacturers that elect to become "participating manufacturers" make payments to the state and voluntarily agree to the same restrictions on advertising, lobbying, and product placement as the original signatories to the settlement. Those manufacturers that choose not to become "participating manufacturers" pay a fee that for the years 2003 through 2006 is $.0167539 per cigarette sold in the state, and for the years 2007 and thereafter is $.0188482 per cigarette sold. In *S & M Brands*, the federal district court upheld the escrow requirement on the same grounds we employ here: the escrow payments required under the national tobacco settlement are no greater than the amounts the manufacturer would be obligated to pay by participating in the settlement.

> Thus, the focus of the unconstitutional conditions doctrine is on whether a governmental entity is denying a benefit to Plaintiffs that they could obtain by giving up their freedom of speech, or is penalizing them for refusing to give up their First Amendment rights. The Court finds that no such condi-

tions are imposed upon Plaintiffs under Tennessee's legislative scheme. The Escrow Act, as amended by the ASR Amendment, leaves Plaintiffs no worse off financially than they would be under the [Master Settlement Agreement], because it expressly provides that Plaintiffs are entitled to a refund on any amounts paid into escrow that they can demonstrate is in excess of the amount they would have paid under the [Master Settlement Agreement]. Further, Plaintiffs retain all of the First Amendment and other rights that the [participating manufacturers] gave up when they signed the [Master Settlement Agreement]. Because Defendant is neither denying a benefit to Plaintiffs that they could obtain by giving up their freedom of speech nor punishing Plaintiffs for refusing to give up their free speech rights, the unconstitutional conditions doctrine does not apply.

*Id.* at 637–38 (citations omitted).

We therefore affirm the court of appeals' holding that the Act does not unconstitutionally infringe appellants' First Amendment rights.

### III.

Appellants also challenge the statute as unconstitutional under the Uniformity Clause and on equal protection grounds. The Uniformity Clause of the Minnesota Constitution, art. X, § 1, requires that taxes be "uniform upon the same class of subjects" but allows taxes to differ between subject classes. The legislature has broad discretion in granting tax exemptions. *Rio Vista Non–Profit Housing Corp. v. County of Ramsey*, 335 N.W.2d 242, 245 (Minn.1983) (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). We have stated we will not disturb a tax classification unless the classification is "clearly arbitrary and has no reasonable basis." *In re Cold Spring Granite Co.*, 271 Minn. 460, 466, 136 N.W.2d 782, 787 (1965). And, consistent with our deference to the legislature in this area, we have quoted with approval the United States Supreme Court's holding that those who would challenge a tax classification must show "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Hegenes v. State*, 328 N.W.2d 719, 721 (Minn.1983) (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)).

Having decided the Act does not unconstitutionally restrict appellants' First Amendment rights, we review their Uniformity Clause challenge under the rational basis standard. *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 421–22 (Minn.2005), quoting *Westling v. County of Mille Lacs*, 581 N.W.2d 815, 820 (Minn.1998) (when the challenged statute does not involve a suspect classification or a fundamental right, the appropriate standard of review is rational basis). Our rational basis test requires us to consider three elements:

(1) the distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the

statute must be one the state can legitimately attempt to achieve.

*Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979). We turn now to that analysis.

## A.

■ As we did in *Erie Mining Co. v. Comm'r of Revenue,* 343 N.W.2d 261, 268 (Minn.1984), when conducting a rational basis review we consider the purpose of the statute first. In enacting Minn.Stat. § 297F.24, the legislature gave three express purposes:[3]

> (1) ensure that manufacturers of nonsettlement cigarettes pay fees to the state that are comparable to costs attributable to the use of the cigarettes;

> (2) prevent manufacturers of nonsettlement cigarettes from undermining the state's policy of discouraging underage smoking by offering nonsettlement cigarettes at prices substantially below the cigarettes of other manufacturers; and

> (3) fund such other purposes as the legislature determines appropriate.

Minn.Stat. § 297F.24, subd. 1(b).[4]

We have previously upheld taxes aimed at the state's first expressed purpose, namely, shifting or internalizing the social costs of a product. For example, in *Miller Brewing,* we analyzed an excise tax on beer, against which in-state manufacturers received a credit. *Miller Brewing,* 284 N.W.2d at 355. Although a brewer with no production facilities in the state claimed the tax violated the Uniformity Clause, we upheld the tax, noting the credit reflected in part that in-state brewers paid substantially more of the "social costs" resulting

from the sale of beer in the state, such as costs for law enforcement and welfare. *Id.* at 356–57. Similarly, in *Westling v. County of Mille Lacs,* 581 N.W.2d at 821, we upheld against a Uniformity Clause challenge a special tax on environmentally contaminated property because, in part, contaminated property imposes a "greater burden on society" than uncontaminated property. In *Hegenes,* 328 N.W.2d at 721, 723, we also upheld against a Uniformity Clause challenge a state tax statute that imposed higher taxes on residential real estate of four or more rental units, because larger multi-unit properties may differ from smaller properties in their use of governmental services such as fire and police protection.

And we have previously upheld taxes aimed at the state's second expressed purpose, namely, preserving competition. So, for example, in *Lifteau v. Metropolitan Sports Facilities Comm'n,* 270 N.W.2d 749, 755 (Minn.1978), we upheld the exemption of three communities from the 2 percent tax imposed on retail beer and liquor sales in the metropolitan area. *Id.* at 752. Because those communities were located on the outskirts of the metropolitan area, they had licensed on-sale establishments both within and outside the area subject to tax. As we observed, if the legislature had not exempted those communities from the tax, competing on-sale establishments in the same community would have borne unequal burdens. *Id.* at 755. In *Brainerd Area Civic Ctr. v. Comm'r of Revenue,* 499 N.W.2d 468, 471–72 (Minn.1993), we upheld a graduated tax on combined gambling receipts because it

---

**3.** We use the terminology given by the legislature to the payments required by the statute, and take no position on whether the payments are "fees" or "taxes."

**4.** Although the statute refers to payments by manufacturers, as we indicated above, under Minnesota's Unfair Cigarette Sales Act, the fee is added to the minimum price of cigarettes and therefore is paid by smokers.

leveled the playing field between large and small gambling operators.

■ However, in analyzing the purpose of the classifications created by the statute, we are not restricted to those purposes expressly stated by the legislature. Rather, *any* legitimate purpose can support the classifications created by the statute. *In re McCannel*, 301 N.W.2d 910, 917 (Minn.1980). So, for example, in *Westling* we acknowledged as legitimate a tax classification because, as we independently noted, a tax on contaminated property recaptures revenues lost when property values decline due to the contamination. 581 N.W.2d at 821. Also in *Westling*, we upheld a tax classification designed, in part, to change the behavior of those being taxed when we noted the tax on contaminated property gives owners of contaminated property an incentive to clean it up and encourages owners of uncontaminated property to act responsibly to avoid the tax. *Id.*

In accordance with these precedents, Minn.Stat. § 297F.24 has many legitimate purposes: internalizing the health care costs of cigarettes; discouraging underage smoking by limiting access to cheaper cigarettes; leveling the playing field between manufacturers already paying substantial sums to the state and newcomers who have gained market share at their expense; and recapturing revenue lost as the market shares of the settling manufacturers have declined.

### B.

■ Having established that Minn. Stat. § 297F.24 has legitimate purposes, we continue our rational basis review by looking next to the classifications established by the statute. Under *Miller Brewing*, we ask whether the classifications established by the statute are reasonably related to those purposes—stated and un-stated—based on their "logical effect." *Miller Brewing*, 284 N.W.2d at 357. Again, the answer is yes.

The law imposes a fee of 35¢ per pack of cigarettes. Some cigarettes are exempt: those included in the computation of payments made to the state under the 1998 tobacco settlement and those as to which the manufacturer has agreed to a separate voluntary settlement with the state.

No matter which purpose we choose, the classifications (settling versus nonsettling) are relevant and logical. For example, if the purpose of the statute is to ensure that all cigarettes sold contribute toward the costs attributable to the use of those cigarettes, it is reasonable to impose an additional charge on the cigarettes of those manufacturers who are not otherwise contributing through either the tobacco settlement or individual voluntary settlements. If the purpose of the statute is to discourage underage smoking, it is reasonable, given the correlation between the cost of cigarettes and underage smoking, to impose an additional cost on low-cost cigarettes to drive up their prices. If the purpose of the statute is to level the playing field between settling and nonsettling manufacturers, it is reasonable to impose additional costs on the cigarettes of non-settling manufacturers. If the purpose of the statute is to recapture revenue lost by the state as the major manufacturers lose market share, it is reasonable to impose additional fees on the cigarettes of those manufacturers whose market share is increasing because the logical effect will be an increase in revenues collected. Because its classification is reasonably related to its purposes, Minn.Stat. § 297F.24 satisfies the second prong of the *Miller Brewing* test.

### C.

■ Finally, we ask whether the differences between the taxpayers distin-

guished by the statute provide a "natural and reasonable basis" for separate classifications. *Miller Brewing,* 284 N.W.2d at 356. As indicated by *Miller Brewing,* our inquiry is whether there are substantial differences between settling and nonsettling manufacturers and, if so, whether those differences provide a "natural and reasonable basis" for treating them differently. Again, the answer to both questions is yes. There are substantial differences between settling and nonsettling manufacturers. Settling manufacturers make payments to the state to cover the social costs of smoking; nonsettling manufacturers make no such payments. Settling manufacturers have agreed to changes in their behavior and marketing practices that are designed to reduce the health effects of their products in the future; nonsettling manufacturers have agreed to no such changes and, as a result, the state can expect to incur increasing costs in the future attributable to the use of nonsettling manufacturers' products. Settling manufacturers have agreed to discourage underage smokers from buying their cigarettes; nonsettling manufacturers have made no such agreement and, in fact, have taken advantage of the settling manufacturers' price increases to increase their own sales. Given the purposes of the statute, it is natural and reasonable to require the buyers of nonsettling manufacturers' cigarettes to pay something toward the future health care costs to which their use of those cigarettes will give rise.

As shown above, the purposes of Minn. Stat. § 297F.24 are legitimate, the classifications established by the statute are reasonably related to those purposes, and the differences between settling and nonsettling manufacturers provide a natural and reasonable basis for treating them differently under the statute. Thus, under our analysis in *Miller Brewing,* Minn.Stat. § 297F.24 is constitutional.

## D.

While appellants agree the state has a legitimate interest in curbing the health care costs associated with cigarette smoking, they deny the state can require them to make payments comparable to the payments made by the Majors because, according to appellants, there is no proof they have done anything wrong.

Whether appellants have engaged in any wrongdoing is irrelevant to the inquiry: it is the harmful nature of their products that triggers the payment, and that their products are harmful is not disputed. The state need not, and should not be required to, allege wrongdoing against nonsettling manufacturers who admit the health effects of their products are no different from manufacturers who are already making payments to the state to cover those health costs. Nor should the state have to allege wrongdoing in the marketing or sale of a product that is acknowledged to be harmful in order to require the consumers of that product to bear at least some of the cost of rectifying that harm.

Appellants' focus on the differences between Minn.Stat. § 297F.24 and the "qualifying statutes" required under the national tobacco settlement as proof of the Minnesota statute's unconstitutionality is also misplaced. Approximately six months after execution of the Minnesota settlement agreement, 46 states and 6 other United States jurisdictions also settled their lawsuits against the major tobacco manufacturers by entering into a "Master Settlement Agreement." Like Minnesota's settlement, the Master Settlement Agreement (to which Minnesota is not a party) requires the participating tobacco manufacturers to make large settlement payments over time, to make additional annual payments in perpetuity, and to

agree to certain restrictions on lobbying and advertising.

The Master Settlement Agreement anticipates that, as the participating manufacturers raise their prices to cover the costs of the master settlement, they will lose market share to nonparticipating manufacturers. Thus, as noted above, the Master Settlement Agreement requires participating states to enact "Qualifying Statutes" to neutralize the competitive advantage of nonparticipating manufacturers. Under the model "Qualifying Statute," manufacturers of tobacco products must either join the Master Settlement Agreement or deposit a specified amount of funds into an escrow account each year. Manufacturers that choose to deposit funds into an escrow account are entitled to receive the interest or other appreciation earned by those funds while they remain in the escrow account. Funds that are not paid out in judgments or settlement based on the manufacturer's liability are returned to the manufacturer after 25 years.

These Qualifying Statutes have been challenged on equal protection grounds and upheld as constitutional. For example, in *PTI, Inc. v. Philip Morris Inc.*, 100 F.Supp.2d 1179, 1207 (C.D.Cal.2000), nonsettling manufacturers argued California's Qualifying Statute was not rationally related to any legitimate government objective. But the court upheld the statute, deferring to the legislature's determination that the statute was necessary to guarantee a source of recovery in potential future lawsuits against the nonsettling manufacturers. *Id.* The court also held that reducing the total quantity of inexpensive cigarettes available within the state was "a rational response to a known health threat." *Id.* at 1207–08. Similarly, in *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 351 (4th Cir.2002), the court acknowledged that Virginia's

Qualifying Statute created distinctions among manufacturers based on whether the manufacturer joined in the Master Settlement Agreement. But the court held those distinctions were rationally related to Virginia's legitimate purpose of recovering from all manufacturers the state's future costs related to cigarette smoking. *Id.* As to the nonsettling manufacturers' complaint that they were required to pay more than the settling manufacturers, the court noted that the settling manufacturers had agreed to conduct restrictions to which the nonsettling manufacturers were not subject. *Id.* at 352–53. As the court observed, the nonsettling manufacturers were free to manufacture and market their products as they chose, but by paying funds into escrow they were essentially providing a surety bond against future liability for tobacco-related health care costs. *Id.* at 352. *See also S & M Brands*, 393 F.Supp.2d at 604 (stating that Tennessee's Qualifying Statute did not violate the Equal Protection clause even if nonsettling manufacturers are treated differently because the distinctions between the nonsettling and settling manufacturers were rational and related to a legitimate purpose).

Although the model Qualifying Statute requires nonparticipating manufacturers to make escrow payments that approximate the payments made by participating manufacturers, the amounts paid with respect to appellants' products under Minn.Stat. § 297F.24—1.75¢ per cigarette, 35¢ per pack—are substantially less than the amounts paid by the Majors. Moreover, the payments are not intended to be available to pay any judgment or settlement for past, present, or future misconduct in the marketing or selling of appellants' cigarettes. Their purpose is simply to reimburse the state, in part, for known future health care costs attributable to the use of the cigarettes and to discourage cigarette use by those who are under age. We will

not second-guess a legislative tax classification that is not arbitrary and that has a reasonable basis in fact.

For these reasons, we hold that the Act does not violate the Uniformity Clause of the Minnesota Constitution and does not violate appellants' equal protection rights.

## IV.

■ Nor does Minn.Stat. § 297F.24 constitute a bill of attainder. In *Reserve Mining Co. v. State,* 310 N.W.2d 487, 490 (Minn.1981), we defined a bill of attainder as a statute that "specifically singles out an identifiable group or individual for the infliction of punishment by other than judicial authority." Appellants argue the statute is a bill of attainder because it "applies only to designated entities," presumably appellants. In *Reserve Mining,* we rejected the argument that a tax that applied only to taconite tailings not deposited on land in accordance with permits was a bill of attainder. *Id.* at 492. We did so even though the tax, in practice, affected only Reserve Mining—the only taconite producer at the time still dumping taconite tailings into Lake Superior. *Id.* at 490. Here, the statute in question, on its face, requires a payment with respect to all cigarettes, and the categories of cigarettes exempt from the tax are defined broadly. If this statute constitutes attainder, which it does not, so does every statute that requires payments with respect to some products and not others.

Nor are the payments imposed by the statute "punishment" exacted on appellants for their refusal to settle with the state. Again, at 35¢ per pack, the fee imposed on appellants' products is only about half what the Majors pay and about two-thirds of that imposed on other settling manufacturers—hardly punishment for refusing to settle.

We conclude that Minn.Stat. § 297F.24 does not violate appellants' rights under the First Amendment, does not violate appellants' right to equal protection under the United States Constitution or uniformity under the Minnesota Constitution, and does not constitute a bill of attainder under either constitution.

Affirmed.

ANDERSON, RUSSELL A., C.J., and GILDEA, J., took no part in the consideration or decision of this case.

MEYER, Justice (dissenting).

Because I would conclude that even under a rational basis standard of review the statute fails a Uniformity Clause challenge, I respectfully dissent.

## I.

In my view, the Act must be viewed in light of the litigation that gave rise to it. The state's 1994 lawsuit against the major cigarette manufacturers and their trade associations traces its origins to the formation of the Tobacco Institute and the Tobacco Industry Research Committee, later renamed the Council for Tobacco Research. In its 1994 lawsuit, the state alleged that, by forming these trade associations, the tobacco industry "undertook a special and continuing duty to protect the public health by representing that it would conduct and disclose unbiased and authenticated research on the health risks of cigarette smoking." The state alleged that, instead of fulfilling that obligation, the trade associations facilitated the deception of the American public about the health effects of smoking. According to the state's complaint, there was a conspiracy among tobacco manufacturers to suppress independent research on the adverse health effects of smoking. The state also alleged that the industry knowingly and actively induced children and adolescents

to smoke, in order to replace the approximately 400,000 individuals who die each year from smoking-related illnesses.

Thus, when the state sued the Majors in 1994, the state alleged that the defendants were responsible for health care costs incurred by the state as a result of the defendants' wrongful conduct in deceptively advertising their cigarettes and misleading the public about known health risks of smoking. And, when the state settled with the Majors in 1998, the state released the Majors from all past and future tobacco-related claims the state had, or might have, against them, including "without limitation any future claims for reimbursement for health care costs allegedly associated with use of or exposure to [t]obacco [p]roducts."

## II.

Against this historical backdrop, I begin my analysis of the statute with appellants' challenge under the Uniformity Clause. Like the majority, I apply the rational basis standard of review. *See Scott v. Minneapolis Police Relief Ass'n, Inc.*, 615 N.W.2d 66, 74 (Minn.2000). Under that standard, the statute must satisfy three tests:

> (1) the distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law, that is, there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; (3) the purpose of the

statute must be one that the state can legitimately attempt to achieve.

*Miller Brewing Co. v. State*, 284 N.W.2d 353, 356 (Minn.1979). And, like the majority, I address the last test first, because the purpose of the statute is relevant to analysis of the first two tests.

I generally agree that the state has a legitimate interest in curbing the health care costs associated with cigarette smoking. The Minnesota Department of Health estimates that "[s]moking costs Minnesota approximately $1.3 billion annually, the equivalent of approximately $3.36 for every pack of cigarettes sold, or $277 per Minnesota resident per year." Minnesota Department of Health, *Preventing and Reducing Tobacco Use* at 1 (updated Dec. 9, 2003), *http:// www.health.state.mn. us/divs/hpcd/tpc/background.html*. Because smoking imposes substantial health care costs on the state, it is legitimate for the state to impose a fee on the products that generate those costs to recover some or all of those costs.[1] Indeed, appellants do not appear to challenge the authority of the state to tax cigarettes—all cigarettes, that is—to recoup costs that result from their use. I further agree that discouraging underage smoking is a legitimate state goal and that the state may pursue that goal by reducing the availability of low-cost cigarettes through the imposition of a fee on cigarettes. The problem is that, in the Act, the legislature stated that it was addressing these general purposes only with respect to nonsettlement cigarettes.

That brings into issue the other two rational basis factors. The first element of the rational basis test asks whether the distinctions between those required to pay the fee and those exempt from paying the

---

**1.** Like the majority, I use the terminology adopted by the statute, and take no position on whether the payments required by either the Act or the tobacco settlement are "fees" or "taxes."

fee are genuine and substantial, rather than arbitrary and fanciful. The court of appeals described the two classes created by the Act simply as settling manufacturers, on the one hand, "[who] are making annual payments," and nonsettling manufacturers, on the other hand, "[who] are not." *Council of Indep. Tobacco Mfrs. of America v. State*, 685 N.W.2d 467, 474 (Minn.App.2004). Similarly, the state argues that, absent the fees imposed by the Act, nonsettlement manufacturers are not required to pay for the health care costs created by their products, whereas the Majors have internalized those costs in the form of their required settlement payments. While true, these descriptions do not fully describe the distinctions between the two classes. It is more complete to say that the class exempt from the fee is cigarette manufacturers who were sued by the state for fraud and deceptive trade practices, whose unlawful actions were alleged to be the cause of increased health care expenditures incurred by the state, and whose payments to the state are based on their settlement of those allegations of unlawful conduct.[2] In contrast, the class subject to the cigarette fee is manufacturers who were not sued by the state and as to whom no allegations of unlawful conduct have been either made or settled by the state.

Thus, because nonsettling manufacturers such as appellants were not sued for increasing health care costs by engaging in illegal conduct, they can charge less for cigarettes but must pay the fee, whereas settling manufacturers like the Majors are exempted from the fee because they are making payments under a settlement by which they avoided potential liability for increased health care costs caused by their alleged wrongful conduct. In essence, the legislature has attempted to treat those disparate situations similarly under the Act by imposing a fee on nonsettling manufacturers' products that is intended to put their cigarettes in a financial posture comparable to those of settling manufacturers. In this sense, the question is whether the similarities between the two classes, rather than the distinctions, are genuine and substantial. *Cf. Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike * * *."). I conclude they are not.

The contrast between this Act and the model qualifying statute created in the Master Settlement Agreement is illuminating. Six months after the Minnesota settlement agreement, 46 states and 6 U.S. territories also settled their lawsuits against the major tobacco manufacturers by entering into the "Master Settlement Agreement." Like the Minnesota settlement, the Master Settlement Agreement requires the major tobacco manufacturers to make large settlement payments over time, to make additional annual payments in perpetuity, and to agree to certain restrictions on lobbying and advertising activities. In exchange, each participating state agreed to release the participating tobacco manufacturers from present and future claims.

The Master Settlement Agreement anticipates that, as the major tobacco manufacturers raise their prices to cover the costs of the national settlement, other tobacco manufacturers will gain market

---

2. The state agreed at oral argument that the state does not have the authority to compel tobacco manufacturers, through litigation, to make payments for health care costs. Indeed, each count of the complaint linked the liability of the Majors not to the health care costs incurred by the state as a result of tobacco use generally, but to increased health care costs caused by their illegal conduct.

share. Therefore, the Master Settlement Agreement encourages all participating states to enact a "qualifying statute," the purpose of which is to neutralize the competitive advantages that a nonparticipating tobacco manufacturer would otherwise enjoy as a result of the increased costs incurred by the participating tobacco manufacturers in the form of settlement payments. A model qualifying statute was included as an exhibit to the Master Settlement Agreement. Subsection (f) of the Findings and Purposes section of the model qualifying statute provides that:

It would be contrary to the policy of the State if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the State to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

All manufacturers of tobacco products are required under the model qualifying statute either to become a participating manufacturer (by agreeing to perform the obligations of the Master Settlement Agreement) or to place a specified amount of funds into a qualified escrow account each year. Those manufacturers that choose to deposit funds into an escrow account are entitled to receive the interest or other appreciation of those funds while they remain in the escrow account. The model qualifying statute provides three circumstances under which the funds in the escrow account may be released: (1) to pay a judgment or settlement won by the state against the manufacturer; (2) to reimburse the manufacturer for deposits in excess of what it would have paid had it been party to the Master Settlement Agreement; or (3) if there has been no judgment or settlement based on the manufacturer's liability, the funds are returned to the manufacturer after 25 years. As noted, the Master Settlement Agreement encourages participating states to pass the model qualifying statute; if a state does not pass such a statute, its continuing settlement payments are reduced.

The goal of the model qualifying statute is similar to that of Minnesota's Act: to put settling and nonsettling manufacturers in a comparable competitive position in pricing their cigarettes. But the payments required of nonsettling manufacturers under the model qualifying statute are premised on potential liability of those manufacturers for wrongdoing, and the escrowed funds are returned to the manufacturer if it is not found liable or does not settle a suit against it within 25 years. Indeed, because of this significant distinction between the Act and the model qualifying statute, the cases cited by the majority that uphold state-enacted model qualifying statutes provide no guidance on this issue.

Here, the classification seeks to use the cigarette fee as a means of compelling cigarette manufacturers that were not sued by the state to bear, one way or another, financial burdens comparable to those borne by manufacturers that were sued by the state. Put another way, the state is imposing a new fee on certain cigarette manufacturers' products in order to reduce the differential between the sale price of cigarettes manufactured by settling manufacturers and the sale price of cigarettes manufactured by companies that have not settled with the state.

Allegations of wrongdoing underlie the entire tobacco lawsuit and its settlement. In contrast, the statute at hand alleges no wrongdoing against appellants but, nevertheless, seeks to compel them to make payments comparable to those made by the settling manufacturers. This statute exempts from taxation one segment of the industry that settled a lawsuit alleging illegal activity, while imposing a tax that is comparable to settlement payments upon a separate segment of the industry that was not sued by the state. Such a classification creates a distinction that is not a genuine and substantial basis for disparate treatment of settling and nonsettling manufacturers within the tobacco industry.

Despite the strong presumption in favor of the constitutionality of statutes and the low hurdle imposed by the rational basis standard, where that standard has not been met both the Supreme Court and this court have struck down taxes as violative of the Equal Protection and Uniformity Clauses. *See Allegheny Pittsburgh Coal Co. v. County Commission,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) (recognizing that the imposition of differing tax burdens upon similarly situated parties must be reasonable); *Nat'l Tea Co. v. State,* 205 Minn. 443, 286 N.W. 360 (1939) (taxing "different persons" at "different rates" for the "privilege of doing the same act," *id.* at 446, 286 N.W. at 361, violates the Uniformity Clause). The Act's attempt to equate payments that emanate from settlement of litigation alleging illegal conduct with a fee that has no connection with wrongful conduct fails the rational basis test, and therefore I would hold that the Act violates the Uniformity Clause.

I therefore respectfully dissent.